FILED
U.S. DISTRICT COURT
DISTRICT OF WYOMING

2018 MAY -1 PM 3: 25

STEPHAN HARRIS, CLERK
CHEYENNE

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF WYOMING

COREY LEE WILLIAMS

Case No.   18-CV-70-F

            Plaintiffs,             Judge

   v.

DAVID FELDMAN               **Jury Trial Requested**

       Dba: Bare Knuckle Fighting Championships, LLC.

       Defendants.

## COMPLAINT FOR DECLARATOY, AND EMERGENCY INJUNCTIVE RELIEF, AND FOR COMPENSATORY AND PUNITIVE DAMAGES

## INTRODUCTION

1. The Plaintiff Corey Williams runs a small home based entertainment business called Who's Your Daddy Productions, of which the their sole annual income is derived from the promotion of a combat sports of various disciplines; specifically Bare Knuckle Fighting (hereafter "BKF").

Williams Complaint for Declaratory, and Emergency Injunctive Relief,
and for Compensatory and Punitive Damages
Page 1 of 24

Receipt #  28756
Summons:_____issed
    ✓____not issued

2. This case involves the development of the sport of bare knuckle fighting and revenue in the form of ticket sales and television rights; the theft of intellectual property and the attempt by the defendant to use trademarking law to monopolize a sport production. Combat sport promoters are responsible for investigating and applying for appropriate state regulation when applicable by law. The Petitioner has conducted several bare knuckle fighting events in the State of Wyoming in cooperation with local and state officials but without state regulation.

3. Bare Knuckle Fighting has been in existence as long as man has walked this earth although it became an organized sport in 1681. Over the next 200 years the sport flourished until it lost public favor to a new gloved combat sport officially recognized as an independent professional sport of "Boxing" in 1891 with the development of the Marquees of Queensberry Rules. By 1900 Bare Knuckle Fighting had fallen out of public favor to the upstart more exciting sport of "Professional Boxing" although it has continued worldwide on a small scale. This Bare Knuckle Fighting has become a cornerstone of the Plaintiff's entertainment platform with massive revenue potential.

4. David Feldman (hereafter "Defendant"), Dba: Bare Knuckle FIghting Championship is a combat sport promoter, Professional Boxing and Mixed Martial Arts specifically, from Pennsylvania.

5. The Plaintiff's claims that the defendant makes false statements publicly and privately which interfere with his business and damage his reputation to gain recognition and investment revenue by taking credit for the plaintiffs accomplishment while implying that the Plaintiff's past events were not legal. The Defendant attempts to use the federal

Williams Complaint for Declaratory, and Emergency Injunctive Relief,
and for Compensatory and Punitive Damages
Page 2 of 24

trademarking process to gain a monopoly of the sport by trade marking common phrases used in the sport.

6. The Defendant has a history of similar actions in other jurisdictions and a history of interference in the plaintiffs business activities and has severely damaged the business and reputation of the Petitioner as well slowed the development and growth of the sport.

## JURISDICTION AND VENUE

7. Plaintiffs have been injured, and are likely to continue to be injured, as a direct result of the Defendant's conduct.

8. The United States District Court of Wyoming has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331.

9. This Court has Jurisdiction over the Defendant because it is present and operates throughout the United States, and is attempting to conduct business in the State of Wyoming.

10. The venue is proper in this court under 28 U.S.C. § 1391 (b) because all incidents, events, and occurrences giving rise to this action occurred in the State of Wyoming.

## PARTIES

11. The Defendant, David Feldman, is a resident of Pennsylvania and is the President of Bare Knuckle Fighting Championships.

Williams Complaint for Declaratory, and Emergency Injunctive Relief,
and for Compensatory and Punitive Damages
Page 3 of 24

12. Bare Knuckle Fighting Championships is a registered Limited Liability Company in Delaware with a recorded physical address at Bare Knuckle Fighting Championships, Suite C, 301 East Dupont Road, Wilmington, Delaware, 19804.

13. The Defendants actions are described in this complaint and are part of a scheme to gain complete control over Bare Knuckle Fighting and get recognition as the originator of the modern sport.

14. Corey Williams, a resident of Evans, Colorado, founded Who's Your Daddy Productions in December 2002 in Longmont, Colorado. Who's Your Daddy is a Sole Proprietor and is a small home based business which specializes in small venue productions rarely venturing into venues with a capacity greater the 1000 spectators. In 2007, the Petitioner included a Bare Knuckle Fight on one of his Mixed Martial Arts shows in Hastings Nebraska. After several years of toying with Bare Knuckle, in 2011, the Petitioner restructured his company and  embarked on bringing Bare Knuckle Fighting back to mainstream. Following December 2014 PPV event the Defendant made contact with the petitioner regarding his Bare Knuckle Events. Prior to this contact the petitioner had no knowledge of the Defendant.

15. The Defendant and Petitioner made contact for the first time in the 4th quarter of 2014. The Defendant wanted to learn how to hold the events I was holding legally as his attempts had failed. It was decided he would bring a couple fighters to compete on my third public "BKF" event 7 March 2015.

16. He was to bring Bobby Gunn to fight a local opponent, Gunn is a notable name in professional boxing and Bare Knuckle.

Williams Complaint for Declaratory. and Emergency Injunctive Relief,
and for Compensatory and Punitive Damages
Page 4 of 24

17. The event attracted fans from 3 countries to the small reservation town of Riverton, Wyoming. The event was a sold out live gate and took place without major incident.

18. The Defendant was a no show tot he event as were his fighters.

19. Following the event the Petitioner refunded tickets to those who requested based on the main event as advertised not happening.

20. The Petitioner had also invested money booking a venue in Rock Springs Wyoming at the Defendants request which the Petitioner was forced to cancel as well causing him further harm.

21. The Petitioner shared his future plans with Defendant in regards to the steps to gaining regulation and major media acceptance including the transition from "Bare Knuckle Boxing" to "Bare Knuckle Fighting." The Defendant then attempted to file a federal trademark, effectively attempting to steal the Petitioners work.

22. The Petitioner made a trip to England to Compete for an English promotion in Bare Knuckle. The Defendant and his agents made calls to customs in an attempt to prevent Petitioner from competing. The Petitioner was held in customs for 14 hours as a result.

23. Following the Petitioner's announcement on his March 17, 2018 promotion that the Wyoming Commission had approved Rules and Regulations the Defendant applied for a Wyoming permit to conduct events.

24. The Defendant has a long history of Fraudulent activities. Cases are attached to this motion.

## Attempts at Resolution

Williams Complaint for Declaratory, and Emergency Injunctive Relief,
and for Compensatory and Punitive Damages
Page 5 of 24

25. The Defendant and Petitioner have spoken several times regarding the Defendant's desire to gain the assistance of the Petitioner to hold Bare Knuckle. The Petitioner wishes to see the sport of Bare Knuckle grow and despite the Defendants past business dealings the Petitioner agreed to assist and support his attempt at promoting Bare Knuckle Fighting. The agreement included joint advertising, a nominal cash payment by the Defendant ($20,000), matching two of the bouts on the Defendants event comprised of local Wyoming fighters, and that the Petitioner and his team were to get complete credit for the past events and its role in Bare Knuckle Fighting becoming a sanctioned professional sport. Some two weeks following the agreement the Defendant contact the Petitioner through an attorney informing the Petitioner that he could not fulfil his agreement. Every interview done by the Defendant he takes full and sole credit for the "first legal" event and for a long period of work in Wyoming to get it sanctioned. In their first conversation the Defendant asked the Petitioner "what state Wyoming is in," how has the Defendant done all this work when he doesn't even know where it is?

## FIRST CAUSE OF ACTION - DEFLIMATION OF CHARACTER

26. The Petitioner has built a well-documented reputation in the combat sport industry for taking a no nonsense approach to the sport and the politics surrounding it. The Petitioner has produced or co-produced 11 state sanctioned events in which "professional boxing" was a component and appropriately regulated under federal law, additional events have been state regulated although without "professional boxing" as a component.

Williams Complaint for Declaratory. and Emergency Injunctive Relief,
and for Compensatory and Punitive Damages
Page 6 of 24

27. The majority of Petitioners events are at the amateur or developmental level.

28. The Petitioner has conducted ticketed events under the following titles: "Battle Bash"(3), "Wednesday Night Fights" (14), "Championship Boxing" (6), "Wyobraska Challenge" (37), "Ultimate Xplosion" (24), and Bare Knuckle Fight Club (3).

29. In 2007, following a Nebraska sanctioned Mixed Martial Arts (hereafter "MMA") event, the Petitioner began exploring the possibilities developing a variation bare knuckle combat.

30. In the third quarter of 2011 The Petitioner closed its doors to evaluate future business propositions and restructure. The result of that restructuring was to focus on the development of a Bare Knuckle Fighting ("BKF") platform. "BKF" is an ancient martial art known as "Irish Martial Arts" that is the original form of combat sports.

31. Irish Martial Arts are practiced worldwide and is incorporated in many other martial arts disciplines. The art is among the oldest recorded in history and is recognized in all states under martial arts statutes, and rules and regulations.

32. Throughout 2012 and the first 2 quarters of 2013 the Petitioner conducted in internal medical study to evaluate the probability of bringing the little seen but widely popular 300 year old sport of "BKF" back into the mainstream of combat sports. That study has multiple levels which include a series of public events. 82 of the 250 (32.8%) public bouts have been completed in the 500 bout multi-level study.

33. The first "BKF" bout in the United States took place May 2, 2014 in Riverton, Wyoming. Prior to holding the event, the Petitioner was in contact with state and local officials to

Williams Complaint for Declaratory. and Emergency Injunctive Relief,
and for Compensatory and Punitive Damages
Page 7 of 24

insure that there was no violation of law. The event was not widely publicized was an

overwhelming success in the local market and was conducted without incident.

34. The next event, 6 December 2014, was the first publicly ticketed and legal Bare Knuckle

event and was advertised through social media and broadcast live on the internet

worldwide. The event took place without incident.

35. Prior the event the Petitioner again verified there was no violation of law. The Petitioner

had an in-depth conversation with Wyoming Commissioner Brian Pedersen regarding

the future possibilities for regulating the sport in Wyoming. Mr. Pedersen said "we want

the revenue" and even drafted a letter, although vague, as further assurance that the

events were not in violation of law or in danger of being shut down by state or local

officials.

36. The Petitioner has now held 11 Legal publicly ticketed Bare Knuckle Events in Wyoming.

37. On September 9, 2017 the Petitioner launched the Bare Knuckle Fight Club in Cheyenne,

Wyoming.

38. To date the Petitioner has invested in excess of $400,000 in the development of Bare

Knuckle Combat.

39. On March 20, 2018 the Wyoming Board of Mixed Martial Arts passed Rules and

Regulations to oversee Bare Knuckle Fighting Events.

40. The Defendant filed for a Wyoming sanction to hold an event in Cheyenne June 2, 2018.

41. The Defendant's advertising claims to be the "first legal" Bare Knuckle Event.

42. The Defendant has made various claims in the media that has been published in online

news articles, the Cheyenne newspaper and on the local news. Of those claims the

Williams Complaint for Declaratory, and Emergency Injunctive Relief,
and for Compensatory and Punitive Damages
Page 8 of 24

Defendant claims that his event is the first "legal" Bare Knuckle event and that he has spent years working to make bare knuckle legal.

43. Both are false statements and both have damaged the reputation of the Petitioner and caused irreparable harm to the Petitioner.

44. The claims have raised question as to the legality of the events held by the Petitioner prior to the Defendant applying for a Wyoming license. That question of legality has cost the Petitioner television and investment monies.

45. The Defendant has never successfully conducted a Bare Knuckle event anywhere in the world and regardless of what his beliefs might be, the events held by the Petitioner were legal.

46. The absence of regulation does not make something "illegal" and the Petitioner can document the steps taken to proceed with his program when the Defendant has failed in his own markets.

47. The Defendants claims ended an ongoing negotiation with the History Channel which had extended a $100,000 offer to do a piece on the Petitioner and his efforts to bring the sport mainstream. The Petitioners advertising sales and investment had grown to $10,000 per event and the Petitioner was in near closing a deal for a $150,000 investment deal for his planned October event in Casper, Wyoming. Do to the Defendants public claims the investment was withdrawn with the investor expressing his concerns as to my truthfulness due to the claims made Defendant in the media. The Petitioners advertising sales have slowed to a stand still, an advertiser who had worked with the Petitioner previously withdrew because of the "public question of legality."

48. Defamation's Four Elements:

49. Part One – A false and defamatory statement concerning another: The Defendant has on multiple occasions stated that his upcoming event is the "first legal" event which implies that the Petitioner was in violation of law. The Defendant has made those false accusations publicly and has been successful in having those claims published.

50. Part Two – Underprivileged publication of the statements of another: The statements of the Defendant were broadcast on local television and published by multiple media outlets. Those statements were false and caused irreparable harm to the Petitioner and his business ventures.

51. Part Three – Statements of Public Concern: The Defendants statements lead to national media coverage which depicts the Petitioner previous events "illegal," damaging both his personal reputation and his business possibilities. None of which was in question prior to the Defendants involvement.

52. Part Four – Damage to the Petitioner: The Petitioner has lost several business opportunities, community support and monetary opportunities, and his relationship with his children as a direct result of the Defendants comments.

## Second Cause of Action – Nuisance

53. The Petitioner's hereby incorporated all the above paragraphs and reallege them as though fully set forth herein.

54. In order to maintain a cause of action for nuisance, a plaintiff must establish that the conduct of a defendant was unreasonable. The Defendant has misrepresented the facts

Williams Complaint for Declaratory, and Emergency Injunctive Relief,
and for Compensatory and Punitive Damages
Page 10 of 24

surround the legality of the sport for his personal gain and has taken actions both

personally and through agents to interfere with the business practices of the Petitioner.

His statement that he will "shut down" the sport for every one to insure he is the only

one doing it is unreasonable and are acts on "the part of a defendant that resulted in an

injury to his/her person or property," Koll-Irvine Center Property Owners Assn. v. County

of Orange, 24 Cal. App. 4th 1036 (Cal. App. 4th Dist. 1994). The Defendant's actions were

not only unreasonable but resulted in a "burden on a plaintiff which was unreasonable",

N.C. Corff pshp. v. Oxy USA, Inc., 1996 OK CIV APP 92 (Okla. Ct. App. 1996). As a result

the Plaintiff has suffered irreparable damage as a result of the Defendant's actions, this

is grounds "to bring an action for abatement of a public nuisance or for damages,"

Revard v. Hunt, 29 Okla. 835 (Okla. 1911).

55. The maintenance of a nuisance action also depends upon the continuity of an action

over a substantial period of time, Hempstead v. S. Zara & Sons Contracting Co., 173

A.D.2d 536 (N.Y. App. Div. 2d Dep't 1991). However, continuity does not mean that such

an act must be habitual or periodical, Metropolitan Life Ins. Co. v. Moldoff, 187 Misc. 458

(N.Y. App. Term 1946). Even a single or occasional act that produces a continuing result

or an injury resulting from an act that is occasional would also constitute a nuisance. The

the constant phone calls and claims to the media renders the Defendant liable for

nuisance. The Defendant has established a pattern of cause and action that shows "the

defendant's acts were the proximate cause for the creation of the nuisance," Sears v.

Hull, 192 Ariz. 65, 70-71 (Ariz. 1998).

Williams Complaint for Declaratory, and Emergency Injunctive Relief,
and for Compensatory and Punitive Damages
Page 11 of 24

56. The Defendant's actions are intentional and add the additional element of "malicious desire to do harm," Musumeci v. Leonardo, 77 R.I. 255 (R.I. 1950). The Defendant continually boasts how he will be the next Dana White and has no remorse in destroying the lives or reputation of anyone who is a threat to his mission and/or desired result.

57. Generally, unless injury or damage from the act done is proven, a nuisance cannot be established, Echard v. Kraft, 159 Md. App. 110 (Md. Ct. Spec. App. 2004). However, courts have divergent views with regard to the essentiality of the element of existence of harm or injury. According to one view, in order to obtain recovery for damages there must be a substantial injury or interference, Rose v. Chaikin, 187 N.J. Super. 210 (Ch.Div. 1982). According to another view, damage is not an essential element in the establishment of nuisance. Further a thing can be a nuisance at any time even without causing an actual damage and hence it is not an essential element of tort. Hence the tort of nuisance must be viewed as a disturbance of some right or interest, Koll-Irvine Center Property Owners Assn. v. County of Orange, 24 Cal. App. 4th 1036 (Cal. App. 4th Dist. 1994).

58. Nuisance Four Elements:

59. Part One – Unreasonable on the part of the Defendant: The Defendant has knowingly and willing made false statements in public taking credit for an event that has already happened. The Defendant attempts to convince any and every person, publication, media outlet, state and local municipalities that his event is the "first legal" Maliciously interferes with the longstanding program of the Petitioner.

Williams Complaint for Declaratory, and Emergency Injunctive Relief,
and for Compensatory and Punitive Damages
Page 12 of 24

60. Part Two – Continuance of acts constituting nuisance for an unreasonable period: The Defendant has made his actions public, there is a media record of his continued claims and his attempts to interfere or sabotage the Petitioners events has gone on for several years. The Defendants attacks and activities increase with every attempt by the Petitioner to cooperate and resolve issues.

61. Part Three – Casual Connection between the Defendant and the nuisance complained of: The connection between the Defendant and the actions in which are the cause of the nuisance is more the casual, the nuisance is directly related and caused by the repetitive claims made by the Defendant. Those public claims further a public perception in which the Defendant uses to claim power and monopolist control over Bare Knuckle Fighting. The Defendant is a public nuisance by every definition.

62. Part Four – Existence of injury or damage: The Defendants activities have cause personal losses and damages in excess of $650,000 to the Petitioner and an unmeasurable amount of damage to future revenues that may have resulted as a part of the Petitioners business ventures. This doesn't include the business relationship permanently damaged by the Defendants personal attacks on the Petitioners character with his "legality" claims. The Petitioner is running for Weld County Sheriff, now the sport that made his face publicly known is being claimed to have been made legal by the Defendant, resulting in hard to the reputation of the Petitioner.

### Third Cause of Action – Negligent Misrepresentation

Williams Complaint for Declaratory. and Emergency Injunctive Relief,
and for Compensatory and Punitive Damages
Page 13 of 24

63. The Petitioner's hereby incorporated all the above paragraphs and reallege them as though fully set forth herein.

64. The Petitioner claims that the Defendant negligently interfered by his misrepresentation and misleading statement to the press and public with a relationship between Petitioner and the people of the state of Wyoming that would have resulted in an economic benefit to the Petitioner.

65. "The tort of intentional or negligent interference with prospective economic advantage imposes liability for improper methods of disrupting or diverting the business relationship of another which fall outside the boundaries of fair competition." (Settimo Associates v. Environ Systems, Inc. (1993) 14 Cal.App.4th 842, 845 [17 Cal.Rptr.2d 757], internal citation omitted.)

66. The Defendant's false claims and attempts to derail the Petitioners program consitutes a disruption of business. His attempts to trade mark every phrase of conntection to the sport of Bare Knuckle Fighting is again a direct attempt to disrupt the business of the Petitioner.

67. "The tort of negligent interference with prospective economic advantage is established where a plaintiff demonstrates that (1) an economic relationship existed between the plaintiff and a third party which contained a reasonably probable future economic benefit or advantage to plaintiff; (2) the defendant knew of the existence of the relationship and was aware or should have been aware that if it did not act with due care its actions would interfere with this relationship and cause plaintiff to lose in whole or in part the probable future economic benefit or advantage of the relationship; (3) the

defendant was negligent; and (4) such negligence caused damage to plaintiff in that the relationship was actually interfered with or disrupted and plaintiff lost in whole or in part the economic benefits or advantage reasonably expected from the relationship." (North American Chemical Co. v. Superior Court (1997) 59 Cal.App.4th 764, 786 [69 Cal.Rptr.2d 466].)

68. "Where a special relationship exists between the parties, a plaintiff may recover for loss of expected economic advantage through the negligent performance of a contract although the parties were not in contractual privity." (J'Aire Corp. v. Gregory (1979) 24 Cal.3d 799, 804 [157 Cal.Rptr. 407, 598 P.2d 60].)

69. The elements of Negligence are as follows:

70. 1) That the Petitioner and numerous contractors to include but not limited to; The Hangar, Bar Nunn, WY; Inside Boxing TV, Denver, Colorado; Sports Complex, Rock Springs, WY; BBad Promotions, United Kingdom; 360 Media, Essix, United Kingdom; Wyoming Board of Mixed Martial Arts, Cheyenne, WY; Justin Wrede, Cheyenne, WY; Billy Martin, Riverton, WY; all additional contractors, competitors and sponsors, were in an economic relationship that probably would have resulted in a future economic benefit to Petitioner;

71. 2) That Defendant knew or should have known of this relationship;

72. 3) That the Defendant knew and intended to disrupted those relationships with unreasonable actions and intentions;

73. 4) That Defendant failed to act with reasonable care;

Williams Complaint for Declaratory, and Emergency Injunctive Relief,
and for Compensatory and Punitive Damages
Page 15 of 24

74. 5) That Defendant knowingly and willfully made false statements knowing that those statements would adversely affect businesses in direct competition with the Defendant;

75. 6) That the relationship was disrupted;

76. 7) That the Petitioner was harmed; and

77. 8) That the Defendant's wrongful conduct and false statement were a substantial factor in causing the Petitioner's harm.

## Fourth Cause of Action – Tortuous Interference

78. The Petitioner's hereby incorporated all the above paragraphs and reallege them as though fully set forth herein.

79. The Defendant has fraudulently misrepresented facts and contacted various contractors, venues and legal agencies to interfere with and damage contractual agreements involved in the promotion of the Petitioner's "BKF" events.

80. The third parties involved include all those listed previously but are not limited to and include all additional competitors and sponsors. The individual contractual obligation involved are numerous and should satisfy the Plaintiff's requirement "to identify a specific customer that the plaintiff would have obtained 'but for' the defendant's wrongful conduct." Zetes v. Stephens, 108 A.D.3d 1014, 1020 (4th Dep't 2013); see Parekh v Cain, 96 A.D.3d 812, 816 (2d Dep't 2012) (dismissing cause of action for tortuous interference with business relations "since the complaint did not identify the third party with whom the plaintiff was engaging in business relations"). Below is one of the many contracts damaged by the Defendant's fraudulent misrepresentation of the

facts surrounding the legalities of the sport and his obsession with being the only Bare

Knuckle promotion in the country.

81. Defendant's status as Plaintiff's competitor is an interesting argument. The defendant's

status as a competitor does not protect the interferer from the consequences of his

interference with an existing contract when the interference is of "Wrongful means."

82. "'Wrongful means' include physical violence, fraud or misrepresentation, civil suits and

criminal prosecutions, and some degrees of economic pressure; they do not, however,

include persuasion alone although it is knowingly directed at interference with the

contract." Guard-Life Corp. v. S. Parker Hardware Mfg. Corp., 50 N.Y.2d 183, 191 (1980).

83. The Defendant's attempts to monopolize the sport through the trademark office and

misleading statements to the media are the "wrongful means" by which the Defendant

interfered with the obligations of the Petitioner.

84. The Defendant's possible defense that contracts were voidable or terminable at will

does not apply as the events have and would have continued in the absence of the

Defendant's interference. "Where contracts terminable at will have been involved, we

have upheld complaints and recoveries in actions seeking damages for interference

when the alleged means employed by the one interfering were wrongful, as consisting of

fraudulent representations . . . or as in violation of a duty of fidelity owed to the plaintiff

by the defendant by reason of a relation of confidence existing between them. . ."

Guard-Life Corp. v. S. Parker Hardware Mfg. Corp., 50 N.Y.2d 183, 194 (1980). The

Defendants actions are a misrepresentation of facts which destroyed confidence of all

contracts involved by depicting the Petitioner as having conducted criminal activity by

Williams Complaint for Declaratory, and Emergency Injunctive Relief,
and for Compensatory and Punitive Damages
Page 17 of 24

conducting his events without sanctioning by a state governing body. The Petitioner made every reasonable effort to resolve the conflict with the Defendant. The Defendant then used the information to further his anti-competitive scheme to eliminate his rival.

85. The Defendant's direct interaction with the Plaintiff has been of open interest and informative. The Defendant's actions and use of information regarding actions and third party involvement is one of interference. Directed at Plaintiff: At no time has the Defendant's conduct been directed at Plaintiff. Defendant's conduct is directed at third parties, by and through the media, with whom Plaintiff has or seeks a business relationship with in connection with "BKF" events. See G.K.A. Beverage Corp. v. Honickman, 55 F.3d 762, 768 (2d Cir. 1995).

86. Tortious Interference with Business Expectations Four Elements (Amaranth LLC v. J.P. Morgan Chase & Co., 71 A.D.3d 40, 47 (1st Dep't 2009)):

87. Part One – The Petitioner had a business relationship with an identified third party: The Petitioner had open business relationships surrounding his Bare Knuckle combat sports events. Those business relationships include contracts with venue to host events, advertisers, material suppliers, media networks, athletes and the spectators. These relationships are all long term relationships necessary to sustain a combat sport promotion in each market. The question in this case is not the existence of a contract or business relationship, it is simply which contract the court chooses to apply or how many collectively were destroyed by the Defendant's unlawful misrepresentation and interference.

88. Part Two - The Defendant had knowledge of the business relationship and intentionally caused the Relationship to go bad: The Defendant was well aware of the existing events and all the contractual obligations surrounding the conduct of the event. The Petitioner made the Defendant aware of additional contractual obligations in phone communication that were outside the normal scope of combat sports promotions. Every event that the Defendant has involved himself in has gone bad and resulted in irreparable harm to the Petitioner's business relationships and personal reputation, not to exclude those unrelated damages caused by his existence. The Defendants involvement in the "BKF" event in Riverton Wyoming not only damaged the Petitioner's contractual obligations to his venue and fans but attached the Petitioner to Defendant's poor reputation causing long term effects.

89. Part Three – The Defendant acted solely out of malice or used improper or illegal means that amounted to a crime or independent tort: The Defendant uses false statements to carefully selected media outlets to claim credit for the Petitioner's work. The Defendants actions possess malice and improper means in which to insure he gain control over the sport of Bare Knuckle Fighting by any means necessarily.

90. Part Four – The Defendant's interference caused injury to the relationship with the third party: The loss of venues, fans and investors based on the questions raised publicly. The loss of revenue on his failing to follow through with his agreement to participate on my March 7, 2015 event was $6,800 directly. There is further loss in future media revenue and markets in which events were canceled as a result of the Defendants failure to follow through with his verbal agreements. The loss of revenue doesn't account for the

Williams Complaint for Declaratory, and Emergency Injunctive Relief,
and for Compensatory and Punitive Damages
Page 19 of 24

time and money spent in an attempt to overturn the damage caused by the Defendants actions.

## Eighth Cause of Action - Emergency Injunctive Relief

91. The Petitioner's hereby incorporated all the above paragraphs and reallege them as though fully set forth herein.

92. The Defendant has acted and continues to act unreasonalbly in his business practices.

93. The Defendant's has no prior involvement in the State of Wyoming and has and will continue to cause irreparable injury if he is allowed to continue with his false claims and hold his June 2, 2018 "Bare Knuckle Fighting Championships" event.

94. The Petitioner has exhausted all attempt to resolve the matter with the Defendant. It cannot be negotiated without further civil and criminal penalties and injunctive relief. The Petitioners are now losing and will continue to lose business profits if the Defendant is allowed to offer false statements publicly.

95. In addition, if not enjoined by an order of the court, the Defendant will continue to offer misleading facts to the public, his event will go forward as "the first legal" in the eyes of the media which will cause harm not only the the Petitioner but to all those who were involved in the December 6, 2014 event promoted by the Petitioner. To allow the Defendant June 2, 2018 event to proceed would virtually destroy the accomplishments of the Petitioner and his promotional team.

## Demand for Relief

Williams Complaint for Declaratory. and Emergency Injunctive Relief,
and for Compensatory and Punitive Damages
Page 20 of 24

96. WHEREFORE, Petitioner, on behalf of himself, respectfully ask the Court for a judgement that:

97. 1) The Court enter an order restricting the claims that can be made by the Defendant regarding the legality of the sport in connection with his events;

98. 2) The Court award a judgement in the of $656,800 for actual damages incurred by the Petitioner;

99. 3) The Court award equitable relief as deemed just and necessary related to the loss of future revenues based on the Defendants activities;

100.    4) The Court grant an Emergency injunctive relief to prevent the June 2, 2018 event of the Defendant in Cheyenne, Wyoming;

101.    5) The Court grant a permanent injunction restraining David Feldman and his associates from interfering with the Petitioner's business and/or taking credit reserved by the Petitioners prior accomplishments;

102.    6) The Court award reasonable attorneys' fees pursuant to Code of Civil Procedure section 1021.5;

103.    7) The Court award costs of the suit;

104.    8) The Court award any other and further relief as the court may deem just and proper.

DATED: May 1, 2018.

Respectfully submitted,

Petitioner

Williams Complaint for Declaratory, and Emergency Injunctive Relief,
and for Compensatory and Punitive Damages
Page 21 of 24

By: _____
Corey Williams

Williams Complaint for Declaratory, and Emergency Injunctive Relief,
and for Compensatory and Punitive Damages
Page 22 of 24

## Demand for Jury Trial

105.    The Plaintiff's hereby demand a jury trial as provided by Rule 38(b) of the Federal

Rules of Civil Procedure.

DATED: May 1, 2018.

Respectfully submitted,

Petitioners

By: _____

Corey Williams

Williams Complaint for Declaratory. and Emergency Injunctive Relief,
and for Compensatory and Punitive Damages
Page 23 of 24

## DECLARATION OF SERVICE BY MAIL

I, Corey Williams, declare as follows:

I am a resident of the State of Colorado, residing in Evans, Colorado. On the 1 May 2018, a

true copy of COMPLAINT FOR DECLARATORY, AND EMERGENCY INJUNCTIVE RELEIF, AND

FOR COMPENSARY AND PUNITIVE DAMAGES was placed in an envelope addressed to:

David Feldman

Law Office of Simon Rosen

2019 Walnut Street

Rittenhouse Square

Philadelphia, Pennsyvania 19103


which envelope, with postage thereon fully prepaid as certified mail, was then sealed and deposited in a

mailbox regularly maintained by the United States Postal Service in Cheyenne, Wyoming.

I declare under penalty of perjury that the foregoing is true and correct and has been

executed.

_____

Corey Williams
RO Box 200122
Evans, Colorado 80620
(331)452-8385

Williams Complaint for Declaratory, and Emergency Injunctive Relief,
and for Compensatory and Punitive Damages
Page 24 of 24

# Cheyenne to host first legal bare knuckle fighting event since 1880's



*By Anna Logan* | Posted: Mon 10:12 PM, Apr 09, 2018 | Updated: Mon 10:50 PM, Apr 09, 2018

**Laramie, Wyo. -** The Capitol City will host the first legal and sanctioned bare knuckle fighting event held in the United States since the 1880's.

"It was such a struggle to get this going because nobody really knows what it is because they haven't seen it in 130 years," said David Feldman, President of a Philadelphia-based Bare Knuckle Fighting Championship.

Feldman continued, "But now they are going to know what it is - it's a great sport and a great night of entertainment and some great athletes and people will have a lot of fun."

Professional fighters from boxing, MMA, UFC and Bellator will be fighting at the event, including Wyoming athletes who will be featured on the card.

The event will take place at the Cheyenne Ice and Events Center on June 2nd.

The Bare Knuckle Championships will be broadcast on Pay Per View and live across the U.S and Canada.

Tickets are available starting at $50 at www.bareknuckle.tv

http://www.wyosports.net/other_sports/bare-knuckle-boxing-card-coming-to-cheyenne/article_0e9a3aa6-3cff-11e8-9a16-9307240d249d.html

# Bare knuckle boxing card coming to Cheyenne

By Tyler Posloski
tposlosky@wyosports.net    Apr 10, 2018

CHEYENNE – It's been more than a century since the last legal bare knuckle boxing match in the United States.

John L. Sullivan went toe to toe with Jake Kilrain just south of Hattiesburg, Mississippi in what became the final bare knuckle title bout ever witnessed.

Thank you for Reading!
Please log in, or sign up for a new account and purchase a subscription to continue reading.

**Log In**



# U.S. SANCTIONS FIRST BARE-KNUCKLE FIGHT SINCE 1889

BY **ELANA GLOWATZ** ON 4/10/18 AT 5:54 PM

2:24  1:11      HD

**SHARE**

**SPORTS**

Wyoming is slated to host the first sanctioned bare-knuckle fight in more than a century, with fighters wearing only wraps on their hands and not gloves.

The bout will be held on June 2 in Cheyenne and will consist of 12 fights, according to the Bare Knuckle Fighting Championship, the organization hosting the event. It is billed as "the first legal/sanctioned bare-knuckle event in over 120 years" in the United States.

The last time there was a regulated bare-knuckle fight in the U.S., the group says, was in 1889. A bare-knuckle fight was held several years ago in Arizona at a casino on Yavapai Nation land, which was not overseen by the state's boxing commission.

Among the fighters listed for the Wyoming event are Ricco Rodriguez, a former UFC heavyweight champion, bare-knuckle heavyweight Bobby Gunn and Joe Riggs, a former World Extreme Cagefighting champion.

# HAWN PATRICK
# Cheyenne to Host First Legal Bare-Knuckle Fight in the U.S. in 120 Years

*posted by Shawn Patrick -3 weeks ago*



There have been just a few bare-knuckle fights in our great country in the last 120 years, but none of them have been legal.

That's about to change as bare-knuckle fighting has been sanctioned again in the United States.

According to *Bleacher Report*, the first gloveless fight in over 120 years will be fought on Saturday, June 2, in Cheyenne, Wyoming, and will feature current professional boxers and former UFC and Bellator fighters--including Bobby Gunn, Ricco Rodriguez and Maurice Jackson.

Bare Knuckle Fighting Championship President David Feldman believes the sport is safer than fighting with gloves, which protect hands but not heads. He adds that the formerly outlawed sport might even cause less serious head injuries.

Tickets start at $50. Get some here.

# Bare Knuckle Fighting Championship

BARE KNUCKLE FIGHTING CHAMPIONSHIP · FRIDAY, APRIL 27, 2018

 Bare Knuckle Fighting Championship (BKFC) is the first promotion allowed to hold a legal, sanctioned, and regulated bare knuckle event in the United States since 1889. Based in Philadelphia, and headed by President and former professional boxer David Feldman, BKFC is dedicated to preserving the historical legacy of bare knuckle fighting, while utilizing a specifically created rule set which emphasizes fighter safety. BKFC will hold all of its bouts in a revolutionary circular four-rope ring, designed to encourage fast-paced and exciting bouts.

The patented BKFC "Squared Circle" contains scratch lines, based on the Broughton Rules which governed bare knuckle fighting in the 19 th century, and which requires fighters to "Toe the Line": start every round face to face, and just inches apart.

In BKFC, only those fighters who are established professionals in boxing, MMA, kickboxing, or May Thai will be allowed to compete. The referees and judges will also be required to have extensive professional combat sports experience. All fights will be held under the auspices and control of an Athletic Commission which is a full member in good standing of the ABC (Association and Boxing Commissions and Combative Sports).

Unlike other fighting organizations and combat sports internationally which claim to be "bare knuckle", but require wraps, tape, and gauze; BKFC is true to its word—as fighters are not allowed to wrap their hands to within one-inch of the knuckle. This makes BKFC unquestionably the truest form of bare knuckle fighting.

BKFC is dedicated to not just creating the safest, most exciting, and highest level bare knuckle fighting organization in the world, it's also leading the way for a new fully recognized

5/1/2018                                    (3) Bare Knuckle Fighting Championship - Home



5/1/2018                                    (3) Bare Knuckle Fighting Championship - Home



Bare Knuckle
Fighting
Championship
@bareknucklefc

# WESTLAW

2015 WL 7258492
Only the Westlaw citation is currently available.
United States District Court,
E.D. Pennsylvania.

**Kerwin v. Cage Fury Fighting Championships**
United States District Court, E.D. Pennsylvania.    November 17, 2015    Not Reported in F.Supp.3d    2015 WL 7258492    *(Approx. 3 pages)*

**Ryan Kerwin, Plaintiff,**

v.

**Cage Fury Fighting Championships, et al., Defendants.**

CIVIL ACTION NO. 14-5159

Signed 11/17/2015

## Attorneys and Law Firms

Ryan Kerwin, Langhorne, PA, pro se.

Christy Adams, Adams Renzi Law, Philadelphia, PA, for Defendants.

### MEMORANDUM

STENGEL, J.

**\*1** *Pro se* **plaintiff**, Ryan Kerwin, has filed a motion for recusal pursuant to 28 U.S.C. § 455(a), arguing that 'there is a clear pattern of antagonism shown within the ruling's [sic] the court has handed down in this **case**.' The defendants take the position that the **plaintiff** has not met his burden of demonstrating a sufficient basis for recusal and that the **plaintiff** is requesting recusal in an attempt to litigate the same issues in front of another judge. For the following reasons, I deny the motion to recuse.

### I. BACKGROUND

On September 8, 2014, Mr. **Kerwin** and Xtreme **Caged** Combat ('XCC') filed a *pro se* antitrust complaint alleging that **Cage Fury Fighting Championships** ('CFFC') and Xtreme **Fight** Events ('XFE') illegally conspired with Chester Downs and Marina LLC, and Valley Forge Casino Resort to monopolize and restrict trade in the mixed martial arts ('MMA') events market in the Philadelphia region. (Doc. No. 45[1] at ¶¶ 3, 4). XCC, CFFC and XFE all promote MMA events in Pennsylvania. (Id. ¶¶ 5, 6). **Plaintiff** XCC was dismissed from the **case** by an Order dated August 20, 2015. (Doc. No. 96). Rob Haydak, the owner of CFFC, and CFFC were dismissed from the **case** by a stipulation filed on October 14, 2015. (Doc. No. 120). Defendant David Feldman owns XFE. (Doc. No. 45 at ¶¶5, 7). Defendant Chester Downs and Marina LLC operate a casino in Chester, Pennsylvania commonly known as Harrah's. (Id. ¶ 9). Defendant Valley Forge Casino Resort operates a casino in Valley Forge, Pennsylvania. (Id. ¶ 12). Valley Forge employs Defendant Joel Freedman as its Vice President of Player Development. (Id. ¶ 15). Mr. Feldman and Mr. Freedman are friends, and Mr. Feldman leveraged this relationship to secure exclusive venue agreements between XFE and each casino with the result that the **plaintiff** is blocked from hosting MMA events at those casinos. (Id. ¶¶ 19, 34, 95). According to the **plaintiff**, by controlling these casino venues, XFE will drive its competition out of business and achieve a monopoly in the MMA event market in Philadelphia. (Id. ¶ 61).

### II. STANDARD OF REVIEW

There is a presumption that a judge is impartial and thus, the party seeking disqualification has a substantial burden and must assert 'objective facts' that demonstrate 'an appearance of impropriety.' United States v. Martorano, 866 F.2d 62, 68 (3d Cir. 1989). A judge 'shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.' 28 U.S.C. § 455(a). 'Beliefs or opinions that merit recusal must involve an extrajudicial factor; 'for example, if a judge has acquired a dislike

## SELECTED TOPICS

Disqualification to Act

Affidavits of Personal Bias or Prejudice of Trial Judge

### Secondary Sources

**Timeliness of affidavit of disqualification of trial judge under 28 U.S.C.A. sec. 144**

141 A.L.R. Fed. 311 (Originally published in 1997)

...This annotation collects and analyzes the federal cases which have dealt with the timeliness required for the filing of an affidavit of disqualification of a federal district court judge under 28 U.S.C...

**Construction and application of 28 U.S.C.A. sec. 455(a) providing for disqualification of justice, judge, magistrate, or referee in bankruptcy in any proceeding in which his impartiality might reasonably be questioned**

40 A.L.R. Fed. 954 (Originally published in 1978)

...This annotation collects and analyzes the federal cases construing and applying 28 U.S.C.A. § 455(a), which provides for the disqualification of a justice, judge, magistrate, or referee in bankruptcy i...

☐ 51(4).    Determination of obj

West's ALR Digest Judges ⊂51(4)

...The document citation is not available at this time

See More Secondary Sources

### Briefs

**BRIEF FOR THE UNITED STATES**

1993 WL 384814
Liteky (John Patrick, Charles Joseph), Bourgeois (Roy Lawrence) v. U.S.
Supreme Court of the United States
Aug. 20, 1993

...The opinion of the court of appeals (J.A. 23-24) is reported at 973 F.2d 910. The judgment of the court of appeals was entered on September 28, 1992. The petition for a writ of certiorari was filed on...

**PETITIONERS' BRIEF**

1993 WL 387331
Liteky (John Patrick, Charles Joseph), Bourgeois (Roy Lawrence) v. U.S.
Supreme Court of the United States
July 19, 1993

...This appeal arises from the judgment of the Eleventh Circuit Court of Appeals dated September 28, 1992 which affirmed the decision of the United States District Court for the Middle District of Georgia...

**Brief for the United States in Opposition**

2016 WL 3040514
Michael E. SULLIVAN, petitioner, v. UNITED STATES OF AMERICA.
Supreme Court of the United States
May 27, 2016

...The opinion of the United States Court of Appeals for the Armed Forces (Pet. App. 1a-26a) is reported at 74 M.J. 448. The opinion of

of a litigant because of events occurring outside of the courtroom, a duty to recuse might ensue.' ' <u>United States v. Vampire Nation</u>, 451 F.3d 189, 208 (3d Cir. 2006)(quoting <u>United States v. Antar</u>, 53 F.3d 568, 574 (3d Cir. 1995)).

The test for recusal under§ 455(a) is an objective one and requires recusal where a 'reasonable person, with knowledge of all the facts, would conclude that the judge's impartiality might reasonably be questioned.' <u>In re Kensington Int'l Ltd.</u>, 368 F.3d 289, 296 (3d Cir. 2004). 'A party seeking recusal need not show actual bias on the part of the court, only the possibility of bias ...Under§ 455(a), if a reasonable man, were he to know all the circumstances, would harbor doubts about the judge's impartiality under the applicable standard, then the judge must recuse.' <u>Selkridge v. United of Omaha Life Ins., Co.</u>, 360 F.3d 155, 167 (3d Cir. 2004)(quoting <u>Krell v. Prudential Ins. Co. of Am. (In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions)</u>, 148 F.3d 283, 343 (3d Cir. 1998)).

\*2 A judge is required to disqualify himself when 'he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding.' 28 U.S.C. Section 455(b)(l). Bias and prejudice 'connote a favorable or unfavorable disposition or opinion that is somehow wrongful or inappropriate, either because it is undeserved, or because it rests upon knowledge that the subject ought not to possess ... or because it is excessive in degree.' <u>Liteky v. United States</u>, 510 U.S. 540, 550 (1994).

It is well-settled in the Third Circuit that 'a party's displeasure with legal rulings does not form an adequate basis for recusal.' <u>Securacomm Consulting, Inc. v. Securacom Inc.</u>, 224 F.3d 273, 278 (3d Cir. 2000). Thus, 'the court must consider whether attacks on a judge's impartiality are simply subterfuge to circumvent anticipated adverse rulings.' <u>Lease v. Fishel</u>, 712 F. Supp. 2d 359, 374 (M.D. Pa. 2010). A judge 'has as strong a duty to sit when there is no legitimate reason to recuse as he does to recuse when the law and facts require.' <u>Id.</u>

### III. DISCUSSION
I find that there are no grounds for recusal here. There is no extrajudicial factor which could have resulted in my dislike of the **plaintiff** nor is there any evidence of any event outside of the courtroom which would have resulted in negative feelings against the **plaintiff.**

The **plaintiff** filed this motion for recusal stating that 'there is a clear pattern of antagonism shown within the ruling's [sic] the court has handed down in this **case**.' In support of his motion to recuse, the **plaintiff** references various adverse rulings that the Court has made against him which he argues evidences a 'serious bias' towards him. The **plaintiff** also filed supplemental amendments to support his motion to recuse, both of which follow close on the heels of rulings adverse to him on previous motions. Neither amendments present 'objective facts' that demonstrate 'an appearance of impropriety,' but rather, both amendments argue that the adverse rulings demonstrate a profound bias against pro se litigants. As the Third Circuit has made clear, the **plaintiff's** displeasure with legal rulings is not a sufficient basis for recusal.

### IV. CONCLUSION
The **plaintiff** has not met his burden of asserting objective facts demonstrating an appearance of impropriety and therefore, I find no reason why I should recuse myself from this action. Accordingly, I deny the **plaintiff's** motion to recuse.

An appropriate Order follows.

### All Citations

Not Reported in F.Supp.3d, 2015 WL 7258492

| Footnotes | |
|---|---|
| 1 | Plaintiffs' Amended Complaint. |

End of Document                    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

the United States Coast Guard Court of Criminal Appeals (Pet. App. 2...

See More Briefs

**Trial Court Documents**

**Com. v. Coleman**

2005 WL 6067742
COMMONWEALTH OF PENNSYLVANIA, v. Tyson COLEMAN.
Court of Common Pleas of Pennsylvania.
July 06, 2005

...DECEMBER TERM, 2003 GREENSPAN, J. DATED: July 6, 2005 On November 13, 2003, defendant Tyson Coleman was arrested and charged with murder and related offenses arising out of the stabbing death of thirty...

**Committee to Save Williams Tp. v. Williams Tp.**

2009 WL 6465180
COMMITTEE TO SAVE WILLIAMS TOWNSHIP, an unincorporated Pennsylvania Association; ALISA Baratta; James Diedzic; Katherine Lilley; Robert Lilley; Jennifer Petrozzo; Jan-Eric Sjodahl; Iris Washburn; George Washburn; Donna Helbing; and Vincent Foglia, Plaintiffs, v. WILLIAMS TOWNSHIP and the Board of Supervisors, a Pennsylvania Municipality; and Sally Hixson, President; Robert Doerr, Vice President; and Fred Mebus, Supervisor, Defendants.
Pennsylvania Court of Common Pleas, Civil Division
Mar. 12, 2009

...This matter is before the court on the plaintiffs' Motion for Reconsideration/Motion for Recusal filed on February 16, 2009. A hearing on the motion was held on February 26, 2009. The matter is ready f...

**Lindsay v. Norfolk Southern Corp.**

2002 WL 34681608
Daniel James LINDSAY, Plaintiff, v. NORFOLK SOUTHERN CORPORATION and/or Norfolk Southern Railway Company, Defendant.
Court of Common Pleas of Pennsylvania.
Sep. 15, 2002

...On May 3, 2004, a jury trial was held in the Beaver County Court of Common Pleas pursuant to claim filed under the Federal Employers' Liability Act (FELA) to resolve a suit for alleged repetitive work-...

See More Trial Court Documents

# WESTLAW

2015 WL 3444274

**United States District Court,**
**E.D. Pennsylvania.**

**Xtreme Caged Combat v. Cage Fury Fighting Championships**
United States District Court, E.D. Pennsylvania.    May 29, 2015    Not Reported in F.Supp.3d    2015 WL 3444274    2015-1 Trade Cases P 79, 211    (Approx. 9 pages)

v.

**CAGE FURY FIGHTING CHAMPIONSHIPS**, et. al., Defendants.

Civil Action No. 14–5159.
Signed May 29, 2015.

## Attorneys and Law Firms

A. Jordan Rushie, Mulvihill & Rushie LLC, Philadelphia, PA, for Plaintiffs.

Ryan Kerwin, Langhorne, PA, pro se.

Jeffrey A. Dilazzero, Mullica Hill, NJ, Christy Adams, Adams Renzi Law, Peter Michael Ryan, Thomas M. O'Rourke, Cozen O'Connor, Philadelphia, **PA**, Robert J. Bush, Robert J. Bush & Associates, West Chester, PA, for Defendants.

## MEMORANDUM

STENGEL, District Judge.

**\*1** Ryan Kerwin and **Xtreme Caged Combat** filed this *pro se* antitrust complaint against several competing mixed martial arts **fight** promotors, two casinos and one casino executive. Plaintiffs also append a count for tortious interference with prospective contractual relations. The casinos and the executive now move to dismiss the amended complaint. For the reasons that follow, I will grant the motion in part.

## I Background

Ryan Kerwin owns and operates **Xtreme Caged Combat** (XCC). XCC is licensed by the Commonwealth of **Pennsylvania** to promote mixed martial arts (MMA) events. Am. compl. ¶¶ 3, 4. MMA is a **combat** sport which features two competitors **fighting** inside an enclosed area. *Id.* ¶ 66. Rob Haydak owns defendant **Cage Fury Fighting Championships** (CFFC). *Id.* ¶¶ 5, 7. David Feldman owns defendant **Xtreme Fight** Events (XFE). *Id.* ¶¶ 6, 8. CFFC and XFE also promote MMA events in **Pennsylvania** and New Jersey. *Id.* ¶¶ 5, 6. Since plaintiffs allege that XFE has merged into CFFC, *Id.* ¶ 45, I will refer to CFFC when discussing allegations against the **fight** promotor defendants

Plaintiffs allege that CFFC illegally conspired with Chester Downs and Marina LLC and Valley Forge Casino Resort to monopolize and restrict trade in the MMA events market in the Philadelphia Region. *Id.* ¶¶ 65—72. Chester Downs and Marina LLC operates a casino in Chester, **Pennsylvania** more commonly known as Harrah's. *Id.* ¶ 9. Valley Forge Casino Resort operates a casino in Valley Forge, **Pennsylvania**. *Id.* ¶ 12. Valley Forge employs Joel Freedman as its Vice President of Player Development. *Id.* ¶ 15. Mr. Feldman and Mr. Freedman are friends, and Mr. Feldman leveraged this relationship to secure exclusive venue agreements between CFFC and each casino. *Id.* ¶¶ 19, 34, 95.

Pursuant to the exclusive venue contracts, Harrah's or Valley Forge will pay CFFC $10,000 for every match it hosts at its respective casino. *Id.* ¶¶ 19, 20, 34. The casinos provide CFFC with a free venue, chairs, tables and other perks. *Id.* The contract gives CFFC the exclusive right to host MMA events at the casinos. *Id.* As a result, plaintiffs are blocked from hosting events at both casinos. *Id.* Plaintiffs admit that there are other facilities where they can host MMA events. *Id.* ¶ 52. However, MMA promotors are unable to make a profit at these other venues. *Id.* ¶¶ 31, 52. According to plaintiffs, by controlling

## SELECTED TOPICS

Torts

Business or Contractual Relations
  Elements of Intentional Interference with
  Existing Contractual Relations

## Secondary Sources

**Cause of Action for Interference with Prospective Business Advantage**
24 Causes of Action 2d 571 (Originally published in 2004)
...This article discusses **actions** for interference with prospective business relationships, beginning with an overview of the elements of a prima facie case , and exploring what the plaintiff must allege...

**Tortious Interference With Contractual Relationship Involving Sale of Real Estate**
64 Am. Jur. Proof of Facts 3d 273 (Originally published in 2001)
...According to the long-standing common law rule, the tort of interference with contract provides a party to a contract with a right of action against a third-party, who intentionally and unjustifiably in...

**Liability for interference with at will business relationship**
5 A.L.R.4th 9 (Originally published in 1981)
...This annotation collects and analyzes the state and federal cases in which the courts have discussed whether a party was liable in damages for interfering, either intentionally or negligently, with an ...

See More Secondary Sources

## Briefs

**Brief for Respondent International Brotherhood of Teamsters**
2009 WL 3453653
GRANITE ROCK COMPANY, Petitioner, v. INTERNATIONAL BROTHERHOOD OF TEAMSTERS & TEAMSTERS LOCAL 287, Respondents.
Supreme Court of the United States
Oct. 26, 2009
...FN* Counsel of Record The abbreviated discussion in Petitioner Granite Rock's brief of the procedural history of this case conspicuously omits information relevant to the merits of Petitioner's current...

**Jurisdictional Statement on Appeal from the Supreme Court of Pennsylvania**
1979 WL 213992
Alan B. EPSTEIN, Sanford I. JABLON, Richard A. WEISBORD, and Arnold J. WOLF, Appellants, v. ADLER, BARISH, DANIELS, LEVIN & CRESKOFF, A Partnership, Appellee.
Supreme Court of the United States
Apr. 05, 1979
...The Opinion rendered by The Supreme Court of Pennsylvania in support of its Judgment from which the present appeal is taken is not officially reported. It is unofficially reported at 393 A.2d 1175 (197...

**JOINT APPENDIX, VOL. II**

these casino venues, CFFC will drive its competition out of business and achieve a monopoly in the MMA event market in the Philadelphia region. *Id.* ¶ 61. As a result of its dominant market position, CFFC has already increased ticket prices for its events. *Id.* ¶ 60. CFFC has also signed over 60 professional fighters to exclusive deals. *Id.* ¶ 61.

On September 8, 2014, Mr. Kerwin filed a *pro se* antitrust complaint on behalf of himself and XCC. By orders dated October 27, 2014 and November 10, 2014, I advised Mr. Kerwin, who is not an attorney, that he may not represent XCC. *See Simbraw, Inc. v. United States,* 367 F.2d 373, 373–74 (3d Cir.1966) (holding that a corporation may not be represented by its president in court and that an attorney must appear for it and represent it in the litigation). Subsequently, attorney Jordan Rushie entered his appearance for **Xtreme Caged Combat.** The casino defendants moved to dismiss the complaint. Doc. no. 4 (Valley Forge); doc. no. 39 (Harrah's). Plaintiffs filed an amended complaint, as of right, which added the charges against Mr. Freedman. Doc. no. 45. The casinos and Mr. Freedman renewed their objections to the allegations in separate motions to dismiss the amended complaint. Doc. no. 47 (Valley Forge); doc. no. 53 (Harrah's); doc. no. 56 (Freedman's notice of joinder in Valley Forge's motion).

**II Standard of Review**

*\*2* A complaint must set forth "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). This statement must "give the defendant fair notice of what the ... claim is and the grounds upon which it rests." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (quoting *Conley v. Gibson,* 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). A complaint need not contain detailed factual allegations, but a plaintiff must provide "more than labels and conclusions" or "a formulaic recitation of the elements of a cause of action" to show entitlement to relief as prescribed by Rule 8(a)(2). *Id.* at 1965; *Evancho v. Fisher,* 423 F.3d 347, 350 (3d Cir.2005). A defendant may attack a complaint by a motion under Rule 12(b)(6) for failure to state a claim upon which relief can be granted.

In deciding a motion to dismiss under Rule 12(b)(6), I may consider "the allegations contained in the complaint, exhibits attached to the complaint and matters of public record." *Pension Ben.Guar. Corp. v. White Consol. Indus., Inc.,* 998 F.2d 1192, 1196 (3d Cir.1993). The court is required to accept as true all of the factual allegations in the complaint, *Erickson v. Pardus,* 551 U.S. 89, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007), and all reasonable inferences permitted by the factual allegations, *Watson v. Abington Twp.,* 478 F.3d 144, 150 (3d Cir.2007), viewing them in the light most favorable to the plaintiff. *Kanter v. Barella,* 489 F.3d 170, 177 (3d Cir.2007). The court is not, however, "compelled to accept unsupported conclusions and unwarranted inferences or a legal conclusion couched as a factual allegation." *Baraka v. McGreevey,* 481 F.3d 187, 195 (3d Cir.2007) (quotations and citations omitted). If the facts alleged are sufficient to "raise a right to relief above the speculative level" such that the plaintiffs' claim is "plausible on its face," a complaint will survive a motion to dismiss. *Bell Atlantic Corp.,* 127 S.Ct. at 1965, 1974; *Victaulic Co. v. Tieman,* 499 F.3d 227, 234–35 (3d Cir.2007).

**III Discussion**

**a) Antitrust Standing**

Standing is a threshold requirement in all actions in federal court. *Ethypharm S.A. France v. Abbott Labs.,* 707 F.3d 223, 232 (3d Cir.2013). Section 4 of the Clayton Act creates a private cause of action and confers standing on persons injured by an antitrust violation. The statute provides:

> any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States ... and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee.

15 U.S.C. § 15(a). "Questions of statutory standing, like other factual issues, are considered under the same pleading requirements as a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6)." *Animal Sci. Products, Inc. v. China Minmetals Corp.,* 05–CV–04376, 2014 WL 3695329 (D.N.J. July 24, 2014) (citing *Baldwin v. Univ. of Pittsburgh Med. Ctr.,* 636 F.3d 69, 73 (3d Cir.2011).

*\*3* Interpreting the statute, the Supreme Court has recognized that "Congress did not intend to allow every person tangentially affected by an antitrust violation to maintain an action to recover threefold damages for the injury to his business or property." *Associated*

2009 WL 2877583
Granite Rock Company, Petitioner, v. The International Brotherhood of Teamsters & Teamsters Local 287, Respondents.
Supreme Court of the United States
Aug. 27, 2009

...COMES NOW, the Plaintiff and complains against the Defendant as follows: 1. This is a suit for damages and injunctive relief pursuant to Section 301(a) of the Labor Management Relations Act, 29 U.S.C. ...

See More Briefs

**Trial Court Documents**

**Rick's Original Philly Steaks, Inc. v. Reading Terminal Market Corp.**

2008 WL 1780822
RICK'S ORIGINAL PHILLY STEAKS, INC., Plaintiff, v. READING TERMINAL MARKET CORPORATION, Paul Steinke, Ricardo Dunston, and Tony Luke's Old Philly Style Sandwiches, Defendants.
Court of Common Pleas of Pennsylvania.
Feb. 20, 2008

...JULY TERM, 2007 COMMERCE PROGRAM AND NOW, this 20 day of February, 2008, in accordance with the court's Opinion issued simultaneously, it is ORDERED as follows: 1. The Preliminary Objections of Reading...

**NATIONWIDE MUTUAL INSURANCE COMPANY, Nationwide Mutual Fire Insurance Company, Nationwide Life Insurance Company, Nationwide General Insurance Company, Nationwide Property and Casualty Insurance Company, and Colonial Insurance Company of Wisconsin f/k/a Colonial Insurance Company of California, Plaintiffs, v. JOHN FLEMING, Joshua Meeder, Mary Lou Fleming, Andrea Meeder, Meeder Fleming & Associates, Inc., Moraine Group, Inc., Moraine Management, Inc., Lon**

2001 WL 35928349
NATIONWIDE MUTUAL INSURANCE COMPANY, Nationwide Mutual Fire Insurance Company, Nationwide Life Insurance Company, Nationwide General Insurance Company, Nationwide Property and Casualty Insurance Company, and Colonial Insurance Company of Wisconsin f/k/a Colonial Insurance Company of California, Plaintiffs, v. John FLEMING, Joshua Meeder, Mary Lou Fleming, Andrea Meeder, Meeder Fleming & Associates, Inc., Moraine Group, Inc., Moraine Management, Inc., Lon
Court of Common Pleas of Pennsylvania.
Oct. 02, 2001

...DIAMOND, D.J. Plaintiffs commenced this diversity action on August 27, 1999, seeking redress for lost premium income, corporate opportunities and customer good will allegedly arising from the defendant...

**Daniel BARRY, et al., Plaintiffs, v. TEAMSTERS LOCAL UNION NO.8, THE PENNSYLVANIA STATE UNIVERSITY, and Penn State Geisinger Health System, Defendants.**

2001 WL 35923617
Daniel BARRY, et al., Plaintiffs, v. TEAMSTERS LOCAL UNION NO.8, THE PENNSYLVANIA STATE UNIVERSITY, and Penn State Geisinger Health System, Defendants.
Court of Common Pleas of Pennsylvania.
Nov. 30, 2001

...This matter comes before the court on the Motions for Summary Judgment of Pennsylvania State University, (hereinafter, "Penn State"), Penn State Geisinger Health System (hereinafter, "PSGHS"), and Team...

See More Trial Court Documents

*General Contractors of California, Inc. v. California State Council of Carpenters,* 459 U.S. 519, 535, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983) (quoting *Blue Shield of Va. v. McCready,* 457 U.S. 465, 477, 102 S.Ct. 2540, 73 L.Ed.2d 149 (1982)). Courts have narrowed antitrust standing and consider the following factors to determine if the complaint is filed by the proper plaintiff:

> (1) the causal connection between the antitrust violation and the harm to the plaintiff and the intent by the defendant to cause that harm, with neither factor alone conferring standing; (2) whether the plaintiff's alleged injury is of the type for which the antitrust laws were intended to provide redress; (3) the directness of the injury, which addresses the concerns that liberal application of standing principles might produce speculative claims; (4) the existence of more direct victims of the alleged antitrust violations; and (5) the potential for duplicative recovery or complex apportionment of damages.

*Ethypharm S.A. France,* 707 F.3d at 233 (citing *In re Lower Lake Erie Iron Ore Antitrust Litig.,* 998 F.2d 1144, 1165–66 (3d Cir.1993).

The casinos deny that plaintiffs have pleaded an antitrust injury, which "is a necessary but insufficient condition of antitrust standing." *Ethypharm S.A. France,* 707 F.3d at 233 (citing *Barton & Pittinos, Inc. v. SmithKline Beecham Corp.,* 118 F.3d 178, 182 (3d Cir.1997)). Plaintiffs must plead an injury to competition in the relevant market and that plaintiffs are competitors or consumers in the relevant market. *See Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.,* 429 U.S. 477, 489, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977) (An antitrust injury is "of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful"); *Ethypharm S.A. France,* 707 F.3d at 233. The injury cannot impact the plaintiffs alone. *Eichorn v. AT & T Corp.,* 248 F.3d 131, 140 (3d Cir.2001) (citations omitted). The injury must have a wider impact on the competitive market, and plaintiffs' injury must be attributable to the anticompetitive conduct at issue. *Id.; Atl. Richfield Co. v. USA Petroleum Co.,* 495 U.S. 328, 334, 110 S.Ct. 1884, 109 L.Ed.2d 333 (1990). "[T]he existence of antitrust injury is not typically resolved through motions to dismiss." *Schuylkill Energy Res., inc. v. Pennsylvania Power & Light Co.,* 113 F.3d 405, 417 (3d Cir.1997) (citing *Bader v. Alleghen Gen. Hosp.,* 64 F.3d 869, 876 (3d Cir.1995)).

To determine the existence of a competitive injury, a court "must always be attuned to the particular structure and circumstances of the industry at issue." *ZF Meritor, LLC v. Eaton Corp.,* 696 F.3d 254, 283 (3d Cir.2012). Due to the economics of mixed martial arts promotion, a promoter cannot stay in business without access to casino venues. Am. compl. ¶ 52. By restricting access to the casinos, CFFC will eliminate all competition in the relevant geographic market. *Id.* ¶ 61. CFFC has achieved dominant market position through its control of the casinos and has considerably raised prices as a result. *Id.* On this basis, plaintiffs have alleged harm to competition. *See Harrison Aire, Inc. v. Aerostar Int'l, Inc.,* 423 F.3d 374, 381 (3d Cir.2005) (supracompetitive pricing is evidence of an antitrust violation); *Gulfstream III Associates, Inc. v. Gulfstream Aerospace Corp.,* 995 F.2d 425, 429 (3rd Cir.1993) (decrease in competition is harm contemplated by antitrust laws).

*\*4* Contrary to the casinos' position, the amended complaint alleges that plaintiffs are competitors in the MMA market. *See Gulfstream III Associates, Inc.,* 995 F.2d at 429 ("The second requirement is generally met if the plaintiff is a 'competitor [ ]or a consumer in the relevant market.' "). According to defendants, plaintiffs are not the proper parties to bring this action because plaintiffs are not licensed to promote MMA events in **Pennsylvania**. *See Ethypharm S.A. France,* 707 F.3d at 237 (plaintiff drug maker did not suffer antitrust injury because it was not authorized by the FDA to sell relevant product in the United States). This is a compelling argument, but it is based on facts in direct contradiction to plaintiffs' allegations. Accepting as true the well pleaded facts in the amended complaint, Mr. Kerwin holds a matchmaker's license for **Xtreme Caged Combat**. Am. compl. ¶ 4. Henry Marchione, Mr. Kerwin's employee, holds a promoter's license for **Xtreme Caged Combat**. *Id.* With these licenses, **Xtreme Caged Combat** may legally host and promote MMA events. *Id.* Defendants' protestations to the contrary are improper at this point in the litigation. Plaintiffs have plausibly claimed an antitrust injury, and for the purposes of this motion, I find that the plaintiffs have standing. [1]

**b) Count 1—Refusal to Deal**

In Count 1, plaintiffs allege that defendants have refused to deal in violation of section 1 of the Sherman Act. The statute provides that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States ... is declared to be illegal." 15 U.S.C. § 1. To state a claim under section 1, plaintiffs must allege concerted effort; an unreasonable restraint on trade and an effect on interstate commerce. *Armstrong Surgical Ctr., Inc. v. Armstrong Cnty. Mem'l Hosp.,* 185 F.3d 154, 157 (3d Cir.1999) (citing *Fuentes v. South Hills Cardiology,* 946 F.2d 196, 201 (3d Cir.1991)).

### 1) Concerted effort

Concerted action is the catchall term for contract, combination and conspiracy set out in the Sherman Act. To plead this element, the plaintiffs must allege facts plausibly showing a "conscious commitment to a common scheme designed to achieve an unlawful objective." *Monsanto Co. v. Spray–Rite Serv. Corp.,* 465 U.S. 752, 768, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984); *see also Columbia Metal Culvert Co. v. Kaiser Aluminum & Chem. Corp.,* 579 F.2d 20, 33 (3d Cir.1978) ("[T]he alleged conspirators had a unity of purpose or a common design and understanding or a meeting of minds in an unlawful arrangement."). The casinos challenge the allegations on two fronts. First, the casinos argue that they cannot conspire with CFFC because the casinos are not in competition with CFFC. Second, the casinos deny that plaintiffs have sufficiently alleged the existence of an agreement. I am not persuaded by either argument.

The casinos contend that only direct competitors can conspire to violate the Sherman Act. According to this theory, the amended complaint must be dismissed because it does not allege concerted efforts between Harrah's and Valley Forge.[2] However, the casinos ignore a large swath of antitrust law scrutinizing agreements between customers and suppliers known as vertical restraints on trade. *See, e.g., NYNEX Corp. v. Discon, Inc.,* 525 U.S. 128, 136, 119 S.Ct. 493, 142 L.Ed.2d 510 (1998) (finding that a vertical restraint which deprives a supplier of a potential customer is subject to the rule of reason analysis); *Bus. Electronics Corp. v. Sharp Electronics Corp.,* 485 U.S. 717, 730, 108 S.Ct. 1515, 99 L.Ed.2d 808 (1988) (distinguishing between vertical and horizontal restraints on trade). In the vertical restraint context, courts have cautioned that exclusive dealing[3] agreements "can have adverse economic consequences by allowing one supplier of goods or services unreasonably to deprive other suppliers of a market for their goods." *ZF Meritor, LLC v. Eaton Corp.,* 696 F.3d 254, 270 (3d Cir.2012) (citing *Jefferson Parish Hosp. Dist. No. 2 v. Hyde,* 466 U.S. 2, 45, 104 S.Ct. 1551, 80 L.Ed.2d 2 (1984)). Plaintiffs allege a vertical agreement between CFFC and the casinos which prohibits plaintiffs and other promotors from hosting MMA events at the casinos. This is actionable concerted effort in antitrust law.

**\*5** I recognize the logical force of the casinos' argument, but it lacks support in the law. It is hard to imagine what would motivate the casinos to restrict trade in a market in which they do not compete, but in this section 1 claim, the casinos can be liable even though they have no intent to reduce competition. *See Spectators' Commc'n Network Inc. v. Colonial Country Club,* 253 F.3d 215, 221 (5th Cir.2001) ("Conspirators who are not competitors of the victim may have no interest in curtailing competition in a market in which they do not compete; nevertheless, when they have been enticed or coerced to share in an anticompetitive scheme, there is still a combination within the meaning of the Sherman Act."). It is sufficient to have alleged that CFFC devised a plan to reduce competition in the MMA market, and the casinos consciously committed to CFFC's illegal scheme. *Petruzzi's IGA Supermarkets, Inc. v. Darling–Delaware Co.,* 998 F.2d 1224, 1243 (3d Cir.1993) ("However, we have made it clear that the defendants need not share the *same* motive. Rather, all that is required is that they each have a motive to conspire" (citing *Fineman v. Armstrong World Indus., Inc.,* 980 F.2d 171, 214–15 (3d Cir.1992))). Accordingly, an agreement between the casinos and CFFC is actionable concerted conduct.

In the alternative, the casinos submit the written contracts they executed with CFFC. According to the casinos, the contracts conclusively disprove any exclusive arrangement.[4] The contracts contradict the amended complaint's well pleaded allegation which I must accept as true at this stage of the case. Furthermore, the contracts, provided they are authentic, are not the only evidence of concerted action. *See Monsanto Co.,* 465 U.S. 752, 764, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984) (concerted effort may be shown through direct and circumstantial evidence). A court will "look past the terms of the contract to ascertain the relationship between the parties and the effect of the agreement 'in the real world.' " *ZF Meritor, LLC,* 696 F.3d at 270 (citing *United States v. Dentsply Int'l,*

*Inc.*, 399 F.3d 181 at 191 (3d Cir.2005). "A plaintiff may plead an agreement by alleging direct or circumstantial evidence, or a combination of the two." *W. Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85, 99–100 (3d Cir.2010). Among other things, plaintiffs allege that Mr. Feldman must consent before another **fight** promotor can gain entry into the defendant casinos. Am. compl. ¶¶ 50, 51. The complaint contains circumstantial evidence of exclusive dealing and is adequately pleaded. *See W. Penn Allegheny Health Sys. Inc.*, 627 F.3d at 99–100 ("If a complaint includes non-conclusory allegations of direct evidence of an agreement, a court need go no further on the question whether an agreement has been adequately pled." (citing *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 323 (3d Cir.2010))).

### 2) Unreasonable Restraint on Trade

**\*6** There are two different standards used to determine if a restraint on trade is unreasonable. Typically, restraints on trade are judged by the rule of reason. *Ins. Brokerage*, 618 F.3d at 315 (citing *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 882, 127 S.Ct. 2705, 168 L.Ed.2d 623 (2007)). Under a rule-of-reason analysis, the plaintiffs "bear[ ] the initial burden of showing that the alleged [agreement] produced an adverse, anticompetitive effect within the relevant [product] and geographic market." *Id.* at 315 (citing *Gordon v. Lewistown Hosp.*, 423 F.3d 184, 210 (3d Cir.2005)). "If the plaintiff carries this burden, the court will need to decide whether the anticompetitive effects of the practice are justified by any countervailing pro-competitive benefits." *Id.* at 316 (citing *Eichorn v. AT & T Corp.*, 248 F.3d 131, 143 (3d Cir.2001)). On the other hand, there are some agreements which are deemed *per se* illegal and are conclusively presumed to be unreasonable "because of their pernicious effect on competition and lack of any redeeming virtue...." *United States v. Brown Univ. in Providence in State of R.I.*, 5 F.3d 658, 669 (3d Cir.1993) (citing *Northern Pacific Ry. Co. v. United States*, 356 U.S. 1, 5, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958)).

Plaintiffs urge me to find that the agreement alleged between CFFC and the casinos is *per se* illegal. I will decline the invitation because the agreements, as alleged, did not impose price constraints on CFFC or the casinos.[5] *NYNEX Corp.*, 525 U.S. at 136 ("[V]ertical restraint is not illegal *per se* unless it includes some agreement on price or price levels." (citing *Business Electronics Corp. V. Sharp Electronics Corp.*, 485 U.S. 717, 735–36, 108 S.Ct. 1515, 99 L.Ed.2d 808 (1988))); *ZF Meritor, LLC*, 696 F.3d at 271 ("Due to the potentially procompetitive benefits of exclusive dealing agreements, their legality is judged under the rule of reason." (citing *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320 at 327, 81 S.Ct. 623, 5 L.Ed.2d 580 (1961))). To plausibly state a claim for exclusive dealing subject to the rule of reason, plaintiffs must plead: 1.) the relevant product market; 2.) the relevant geographic market and 3.) that the contract forecloses a substantial share of the competition in the relevant product and geographic markets. *Tampa Elec. Co.*, 365 U.S. at 327—28. Defendants contend that the relevant markets are ill-defined.

"The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it." *Brown Shoe Co. v. United States*, 370 U.S. 294, 325, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962). In other words, the relevant market includes all products a buyer would purchase if the seller's product was unavailable or too expensive. *See United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 394, 76 S.Ct. 994, 100 L.Ed. 1264 (1956). While the proper product market is best determined by the trier of fact, *Fineman v. Armstrong World Indus., Inc.*, 980 F.2d 171, 199 (3d Cir.1992), a complaint is legally insufficient when the proposed market clearly excludes interchangeable products. *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 436 (3d Cir.1997). Such a problem arises when plaintiffs unnecessarily narrow the relevant product market to increase the defendant's relative market power. *See Id.* at 438 (Court rejected plaintiff's alleged relevant product market which was limited to pizza ingredients approved for use by Domino's; product market included pizza ingredients used by all pizza restaurants).

**\*7** The parties dispute what product is at issue in this litigation. Plaintiffs define the relevant product as MMA events. Am. compl. ¶ 65. Defendants, on the other hand, claim that the relevant product market is MMA event venues. Defendants maintain that plaintiffs' product definition is deficient because it fails to consider the interchangeability of casinos with other MMA event venues.[6] Given that this is a motion to dismiss, plaintiffs' theory of the case controls. Plaintiffs aver that CFFC's exclusive access to the casinos will eliminate competition in the MMA event market. The proper interchangeability inquiry considers what other **fight** events spectators will attend if CFFC becomes the only

promoter of MMA events and raises prices.[7] Focusing, instead, on what other venues spectators will patronize is largely irrelevant if CFFC is the only company promoting MMA events. Therefore, plaintiffs have not clearly ignored substitute products by defining the product as MMA events.

Defendants attack plaintiffs' proposed geographic market as impermissibly vague. The geographic market must "correspond to the commercial realities of the industry," and may be as small as a single metropolitan area. *Brown Shoe Co.,* 370 U.S. at 336. It is quite clear that plaintiffs have limited the geographic area to the Philadelphia region. Am. compl. ¶ 68. Indeed, the term "Relevant Geographic Market" is set out in bold under its own heading in the amended complaint. Defendants protest that plaintiffs do not apply this definition consistently throughout the complaint. I disagree. Any pleadings pertaining to events outside the Philadelphia region give context to the allegations and do not alter the defined geographic market. If discovery supports an expansion of the geographic market, I will reconsider the issue on a motion for summary judgment, but for the purposes of this motion, the pleaded geographic market is satisfactory.

### 3) Affecting interstate commerce

"[T]he interstate commerce requirement of the Sherman Act may be satisfied by demonstrating that defendant's activities either are in interstate commerce or affect interstate commerce." *Brader v. Allegheny Gen. Hosp.,* 64 F.3d 869, 873 (3d Cir.1995) (citing *McLain v. Real Estate Bd. of New Orleans, Inc.,* 444 U.S. 232, 242, 100 S.Ct. 502, 62 L.Ed.2d 441 (1980). CFFC's allegedly anti-competitive conduct is purely local; therefore, plaintiffs must identify how CFFC's actions affected activity in interstate commerce. *McLain,* 444 U.S. at 242. According to the amended complaint, CFFC's control of the casino venues has allowed CFFC to sign nearly 100 fighters to exclusive contracts in both Pennsylvania and New Jersey. Am. compl. ¶¶ 59, 60. Given the broad reach of the Sherman Act, these allegations easily satisfy plaintiffs' pleading burden. *See Brader,* 64 F.3d at 873. As a result, plaintiffs have plausibly pleaded each element of a section 1 claim, and I will deny the motions to dismiss Count 1.

### c) Count 2—Essential Facilities Doctrine

*8 "[U]nder the 'essential facilities' or 'bottleneck' doctrine, 'a business or group of businesses which controls a scarce facility has an obligation to give competitors reasonable access to it.' " *Cyber Promotions, Inc. v. Am. Online, Inc.,* 948 F.Supp. 456, 460 (E.D.Pa.1996) (citing *Byars v. Bluff City News Co., Inc.,* 609 F.2d 843, 846, 856 & n. 34 (6th Cir.1980)). The elements of an essential facility claim are: "(1) control of the essential facility by a monopolist; (2) the competitor's inability practically or reasonably to duplicate the essential facility; (3) denial of the use of the facility to a competitor; and (4) the feasibility of providing the facility." *Ideal Dairy Farms, Inc. v. John Labatt, Ltd.,* 90 F.3d 737, 748 (3d Cir.1996).

Plaintiffs cannot plead a viable essential facilities claim against the casinos because plaintiffs have not alleged that the casinos are monopolists. The proper defendant for an essential facility claim is the *monopolist* in control of the facility. *See Id.,* at 748; *Cyber Promotions, Inc.,* 948 F.Supp. at 460 (dismissing essential facility claim because defendant was not a monopolist). I am unaware of any caselaw supporting essential facility liability against the *facility* which is controlled by a third party monopolist. CFFC, not the casinos, is the "monopolist" in the plaintiffs' view. There is no allegation that either casino is attempting to monopolize the MMA market in the Philadelphia region. Rather, the casino venues are being controlled by the alleged monopolist. Plaintiffs have not stated an essential facilities claim against the casinos, and I will dismiss Count 2 with prejudice as to the moving defendants.

### d) Count 3—Attempt to Monopolize

Section 2 of the Sherman Act provides: "Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States ... shall be deemed guilty of a felony...." 15 U.S.C. § 2.[8] The Clayton Act authorizes private individuals who are injured by conduct proscribed by the Sherman Act to bring a **civil action** against the monopolist causing them harm. 15 U.S.C. § 15(a). A plaintiff suing a monopolist under section 2 of the Sherman Act may assert three distinct causes of action: 1.) monopolization, 2.) attempted monopolization, and 3.) conspiracy to monopolize. *See Carpet Grp. Int'l v. Oriental Rug Importers Ass'n, Inc.,* 256 F.Supp.2d 249, 282 (D.N.J.2003). While Count 3 is labeled attempt to monopolize, the allegations sound more in conspiracy to monopolize. Either way, the amended complaint fails to state a claim.[9]

The elements of an attempted monopolization claim are: "(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." *Spectrum Sports, Inc. v. McQuillan,* 506 U.S. 447, 456, 113 S.Ct. 884, 122 L.Ed.2d 247 (1993). A claim of conspiracy to monopolize may arise from conduct demonstrating: "(1) an agreement to monopolize; (2) an overt act in furtherance of the conspiracy; (3) a specific intent to monopolize; and (4) a causal connection between the conspiracy and the injury alleged." *Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc.,* 602 F.3d 237, 253 (3d Cir.2010) (citing *United States v. Yellow Cab Co.,* 332 U.S. 218, 224–25, 67 S.Ct. 1560, 91 L.Ed. 2010 (1947); *Am. Tobacco Co. v. United States,* 328 U.S. 781, 788, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946)).

*\*9* Count 3 is not a plausible statement of either claim against the casinos. Instead, the pleadings are almost entirely directed at CFFC. The paragraphs detail how CFFC has gained control of the casino venues in order to restrict trade in the MMA event market. Am. compl. ¶¶ 88, 89. The plaintiffs believe that CFFC's control over the casino venues has allowed CFFC to achieve dominant market power. *Id.* ¶¶ 91, 92. They then jump to the conclusion that, "Both Casino defendants ... have participated in this very same monopoly conspiracy being carried out by [CFFC]." This conclusory statement is insufficient to plead a cause of action for either attempted monopolization or conspiracy to monopolize. *See Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc.,* 602 F.3d 237, 255 (3d Cir.2010) ("But to survive dismissal it does not suffice to simply say that the defendants had knowledge; there must be factual allegations to plausibly suggest as much." (citing *Twombly,* 550 U.S. at 564)).

Further, the attempted monopolization and conspiracy claims have a common element of specific intent to monopolize. This specific intent requirement sets section 2 claims apart from section 1 claims. *See Int'l Distribution Centers, Inc. v. Walsh Trucking Co.,* 812 F.2d 786, 793 (2d Cir.1987) ("Unlike the proof required to establish a conspiracy to monopolize under section 2, a specific intent to create a monopoly is not required under section 1."). In support of their section1 claim, plaintiffs do not allege that the casinos intended to monopolize the MMA event market. Rather, allegations of CFFC's intent to restrict trade in the relevant market combined with the casinos' conscious commitment to the conspiracy were sufficient with respect to Count 1. *See Petruzzi's IGA Supermarkets, Inc.,* 998 F.2d at 1243. Different standards apply to section 2 claims; plaintiffs must plead specific intent as to each party. *See Todorov v. DCH Healthcare Auth.,* 921 F.2d 1438, 1460 n. 35 (11th Cir.1991) ("[W]e analyze the conduct of [each defendant] separately to determine whether [plaintiff] has a valid section 2 claim for relief."). There are no allegations regarding the casinos' intent to monopolize the MMA market. Because the casinos do not compete in the MMA event market, there is no basis to infer they acted with specific intent to monopolize. I will dismiss Count 3 with prejudice.

### e) Count 4—Tortious Interference with Contract

Plaintiffs allege Mr. Freedman tortiously interfered with plaintiffs' prospective contractual relations with Valley Forge. Am. compl. ¶¶ 33, 34, 95; Pls.' Resp. Br., doc. no. 61, **29.** To prevail on this claim, plaintiffs must show: "(1) a prospective contractual relation; (2) the purpose or intent to harm the plaintiff by preventing the relation from occurring; (3) the absence of privilege or justification on the part of the defendant; and (4) the occasioning of actual damage resulting from the defendant's conduct." *Kachmar v. SunGard Data Sys., Inc.,* 109 F.3d 173, 184 (3d Cir.1997) (citing *Thompson Coal Co. v. Pike Coal Co.,* 488 **Pa.** 198, 412 A.2d 466, 471 (1979)).[10] **Pennsylvania** imposes a two year statute of limitations for this cause of action. 42 Pa.C.S. § 5524(3); *Torchia v. Keystone Foods Corp.,* 431 Pa.Super. 83, 635 A.2d 1082, 1086 (1993).

*\*10* As Vice President of Player Development at Valley Forge, Mr. Freedman cannot possibly be liable for interfering with plaintiffs' prospective contract with Valley Forge. "Essential to the right of recovery on this theory is the existence of a contractual relationship between the plaintiff and a party other than the defendant." *Nix v. Temple Univ. of Com. Sys. of Higher Educ.,* 408 Pa.Super. 369, 596 A.2d 1132, 1137 (Pa.Super.1991) (citations omitted). Agency principals dictate that a corporate officer acts on behalf of the corporation; therefore, a corporate officer is not a third party when acting in his official capacity. *Nix,* 596 A.2d at 1137 (citing *Menefee v. Columbia Broadcasting System, Inc.,* 458 **Pa.** 46, 329 A.2d 216 (**Pa.**1974)). If Mr. Freedman frustrated plaintiffs' efforts to host an MMA event at Valley Forge, that was a business decision which does not support a claim for tortious interference.

In response, plaintiffs argue that Mr. Freedman was employed by Harrah's when he interfered with plaintiffs' prospective contract with Valley Forge. Plaintiffs submit a series of emails exchanged between Mr. Kerwin and Jennifer Woodeshick, National Sales Manager for Valley Forge Casino. The emails are dated between November **29**, 2011 and December 5, 2011 and discuss scheduling an MMA **fight** in early April 2012. This conduct happened more than two years before the complaint was filed on September 8, 2014. Any claims arising from the April 2012 events would be time barred. I will dismiss Count 4 as to Mr. Freedman with prejudice.

### f) Mr. Kerwin's continued representation of Xtreme Caged Combat

Mr. Kerwin is proceeding in this action *pro se*. Although he is not an attorney, Mr. Kerwin also attempted to represent XCC. By orders dated October 27, 2014 and November 10, 2014, I instructed XCC to retain counsel. Mr. Rushie entered his appearance on behalf of XCC on December 4, 2014, the same day as the Rule 16 conference in this matter. Nonetheless, a filing error suggests that Mr. Rushie's representation is a sham.

Valley Forge moved to dismiss the original complaint on September **29**, 2014. Doc. no. 4. As the parties discussed at the Rule 16 conference, plaintiffs chose not to respond to Valley Forge's motion and instead filed an amended complaint. Doc. no. 45. Valley Forge renewed its objections and filed a motion to dismiss the amended complaint on January 2, **2015**. Doc. no. 47. Valley Forge served the January 2, **2015** motion on Mr. Rushie by the court's electronic filing system. Since Mr. Kerwin is not an ECF user, Valley Forge attempted to serve the January 2, **2015** motion on Mr. Kerwin by email. However, defense counsel inadvertently emailed Mr. Kerwin the September **29**, 2014 motion.

Plaintiffs filed a joint brief in opposition which erroneously responded to the September **29**, 2014 motion. Doc. no. 50. This is evident because plaintiffs' brief did not address several key arguments which were made in the January 2, **2015** motion, but were not raised in the September **29**, 2014 motion. The parties recognized the error, doc. no. 68 at 13–14, and I granted plaintiffs leave to file a supplemental brief to address the missing arguments. Doc. no. 66.

***11** Mr. Rushie could not have prepared a response to a motion which he never received. Valley Forge served Mr. Rushie with the January 2 motion. Mr. Rushie did not enter his appearance until December 4, 2014, so he did not receive original service of the September **29**, 2014 motion. Furthermore, the plaintiffs decided to file an amended complaint on December 4, 2014, so there is no reason to believe that Mr. Rushie ever reviewed the September **29**, 2014 motion. Mr. Kerwin, on the other hand, received the September **29**, 2014 motion twice. Mr. Kerwin only obtained the January 2, **2015** motion after filing plaintiffs' brief in opposition. Since plaintiffs' opposition responded to the September **29**, 2014 motion, which Mr. Kerwin possessed, and not the January 2, **2015** motion, which was served on Mr. Rushie, I can only conclude that Mr. Kerwin prepared the opposition brief on behalf of both plaintiffs without the assistance of Mr. Rushie.

Plaintiffs' conduct is in direct contravention of my orders dated October 27, 2014 and November 10, 2014. Mr. Kerwin's continued representation of XCC is a continuing violation of the rules of procedure and my orders. These continuing violations could lead to a finding of contempt. Appropriate sanctions for contempt may include dismissal of the complaint with prejudice.

### IV Conclusion

For the foregoing reasons, I will grant defendants' motions to dismiss in part. Counts 2, 3, and 4 are dismissed with prejudice as to Chester Downs and Marina LLC, Valley Forge Casino Resort and Joel Freedman. The motions are otherwise denied.

An appropriate order follows.

### ORDER

**AND NOW,** this 29th day of May **2015**, upon consideration of defendant Valley Forge Casino Resort's motion to dismiss (doc. no. 47), defendant Chester Downs and Marina, LLC's motion to dismiss (doc. no. 48, 53), defendant Joel Freedman's joinder in Valley Forge's motion to dismiss (doc. no. 56), plaintiffs' responses thereto (doc. nos.50, 61), and upon further consideration of defendants' replies (doc. nos.63, 67), and plaintiffs' surreplies (doc. nos.64, 68, 69), **IT IS HEREBY ORDERED** that:

1. Defendants' motions to dismiss (doc. nos.47, 48, 53) are **GRANTED in part.**

2. Counts 2, 3 and 4 are **DISMISSED WITH PREJUDICE** as to Valley Forge Casino Resort, Chester Downs & Marina LLC and Joel Freedman.

3. The motions to dismiss are otherwise **DENIED.**

4. Ryan Kerwin's legal representation of XCC is a continuing violation of the rules of procedure and the previous orders of this court. These continuing violations could lead to a finding of contempt. Appropriate sanctions for contempt may include dismissal of the complaint with prejudice.

## All Citations

Not Reported in F.Supp.3d, 2015 WL 3444274, 2015-1 Trade Cases P 79,211

## Footnotes

| | |
|---|---|
| 1 | "[W]hereas lack of antitrust standing affects a plaintiff's ability to recover, but does not implicate the subject matter jurisdiction of the court[,]" *Sullivan v. DB Investments, Inc.,* 667 F.3d 273, 307 (3d Cir.2011) (internal citations and quotation marks omitted), I will not consider the remaining standing elements *sua sponte.* |
| 2 | "Plaintiffs make no factual allegations to state a plausible claim that [Harrah's] agreed with Defendant Valley Forge or any other casino not to deal with Plaintiffs' MMA promotion" Harrah's mot. to dismiss, doc. no. 53, 8; *See* Valley Forge's mot. to dismiss, doc. no. 47, 17. |
| 3 | "Exclusive dealing exists when a buyer and seller enter into an agreement in which the buyer will only purchase goods or services from that one seller and the agreement forecloses competition." *BanxCorp v. Bankrate, Inc.,* 07–CV–3398, 2009 WL 2986126, at *4 (D.N.J. Sept.14, 2009) (citing *Barr Laboratories, Inc. v. Abbott Laboratories,* 978 F.2d 98, 110 (3d Cir.1992). The venue agreement allegedly provides that the casinos will purchase MMA promotion services from CFFC and no other **fight** promotor. This foreclosed all other **fight** promotors from holding MMA events at the casinos, and is exclusive dealing. |
| 4 | An amendment to CFFC's contract with Harrah's provides CFFC with a right to first refusal for any MMA event to be scheduled at Chester Downs between August 27, 2013 and March 7, 2014. Harrah's mot. to dismiss am. compl., doc. no. 48, Ex. C. |
| 5 | In response to defendants' motion, plaintiffs assert he alleged a price fixing scheme. The only allegation of price fixing is between CFFC and XFE. How such price fixing could occur after CFFC and XFE merged is questionable. In any event, plaintiffs do not allege that the promotors conspired with the casinos to fix prices. |
| 6 | "There are other casinos in **Pennsylvania**, Delaware and New Jersey.... None are considered or explained in the context of the supply and demand conditions in Plaintiffs' alleged product market definition. Nor is there any discussion of non-casino venues, such as Plaintiffs' current venue, that can host MMA events. Valley Forge's Mot. to Dismiss, doc. no 47–1, 20. |
| 7 | Defendants also complain that plaintiffs do not consider boxing events in their market definition. I disagree. Plaintiffs' product definition is broad enough to include boxing matches, i.e. a **combat** sport which features two competitors **fighting** inside an enclosed area. Am. compl ¶ 66. |
| 8 | To the extent plaintiffs assert an attempt to monopolize claim under section 1 of the Sherman Act, the claim is dismissed. An attempt to monopolize claim only exists under section 2 of the Sherman Act. |
| 9 | To the extent plaintiffs plead a conspiracy to attempt to monopolize, such a claim does not exist. IIIB, Phillip Areeda and Herbert Hoovenkamp, *Antitrust Law* ¶ 809 (3d ed. 2006) ("An occasional complaint has alleged that the defendant conspired to attempt to monopolize. Courts have correctly held |

that § 2 states no such offense. Nor is there any need for it, because the combination that offends antitrust policy violates § 1.")

10      I have federal question jurisdiction over plaintiffs' antitrust claims. 28 U.S.C. § 1331. I have supplemental jurisdiction over the pendent state law claims. § 1367. When considering the motions to dismiss the state law counts, I must apply **Pennsylvania** law as interpreted by the **Pennsylvania** Supreme Court. *McKenna v. Pac. Rail Serv.*, 32 F.3d 820, 825 (3d Cir.1994) (citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938)) ("In so doing, we are not free to impose our own view of what state law should be; we are to apply state law as interpreted by the state's highest court."); *Parkway Garage, Inc. v. City of Philadelphia*, 5 F.3d 685, 701 (3d Cir.1993) (applying *Erie* to claims under supplemental jurisdiction). When the Supreme Court has not spoken on the issue, I refer to the decisions of the **Pennsylvania** Superior Court and **Pennsylvania** Commonwealth Court to predict how the high court would rule. *See McKenna*, 32 F.3d at 825. Additionally, I will follow Third Circuit's interpretation of **Pennsylvania** law unless it is inconsistent with a subsequent holding of the state Supreme or intermediate appellate courts. *Aceto v. Zurich Ins. Co.*, 440 F.2d 1320, 1322 (3d Cir.1971) ("No one may properly rely upon what we have held as more than persuasive on a question of **Pennsylvania** law so long as the **Pennsylvania** Supreme Court has not ruled upon that legal question."); *Largoza v. Gen. Elec. Co.*, 538 F.Supp. 1164, 1166 (E.D.Pa.1982) ("[I]t is axiomatic that this court is bound by a decision of the Third Circuit predicating **Pennsylvania** law unless the state supreme court issues a contrary decision or it appears from a subsequent decision of the appellate courts that the court of appeals erred.").

---

**End of Document**                    © 2018 Thomson Reuters. No claim to original U.S. Government Works.



# WESTLAW

⌐⌐ Distinguished by Davis v. Metropolitan Life Ins. Co., M.D.Pa., February 11, 2015

2009 WL 2147843

**Platypus Wear, Inc. v. Bad Boy Club, Inc.**
United States District Court, D. New Jersey.    July 15, 2009    Not Reported in F.Supp.2d    2009 WL 2147843    *(Approx. 11 pages)*

## PLATYPUS WEAR, INC. d/b/a **Bad Boy Brands, Plaintiff,**

v.

### BAD BOY CLUB, INC., BBC–SK8 Shop, LLC and Edward Runner, **Defendants.**

Civil No. 08–02662(NLH)(AMD).
|
July 15, 2009.

---

### West KeySummary

Change View

**1**  **Trademarks** 🔑  Complaint or Petition
A trademark owner sufficiently stated a claim for false designation of origin against a competitor. The competitor used an image identical to the owner's "character" mark which was used to designate the source of the owner's athletic clothing products on **promotional** materials. The owner made a sufficient showing that since the competitor also sold athletic clothing, the competitor's use of the mark would likely cause confusion as to the origin of the products. Lanham Act, § 43(a)(1)(A), 15 U.S.C.A. § 1125(a)(1)(A).

18 Cases that cite this headnote

## Attorneys and Law Firms

Gavin I. Handwerker, Esquire, Nissenbaum Law Group, LLC, Union, NJ, for **plaintiff**.

## OPINION

HILLMAN, District Judge.

**\*1** This matter comes before the Court on **plaintiff's** motion for default judgment and permanent injunction on **plaintiff's** trademark infringement, unfair competition, and dilution claims. For the reasons expressed below, **plaintiff's** motion will be granted in part and denied in part.

## I. BACKGROUND

This suit was brought by Platypus Wear, Inc., d/b/a **Bad Boy Brands** against **Bad Boy** Club, Inc., BBC–SK8 Shop, LLC, and Edward Runner[1] for infringement of the trademarks "**Bad Boy**"[2] and "**Bad Boy Club,**"[3] which is a caricature of a boy flexing his arm.[4] **Defendants** use these marks at their retail business "**Bad Boy Club Surf Skate–Snow**," in its name and exterior sign, and on the World Wide Web in the form of advertising and listing. **Plaintiff** filed its complaint only after **defendants** failed to respond to two letters **plaintiff** sent them that informed **defendants** that **plaintiff** owns the "**Bad Boy Club**" marks and asked **defendants** to desist in using them. **Defendants** were served with the summons and complaint, but they have not answered the complaint or responded in any manner.[5] With no answer or response, **plaintiff** now requests the entry of default against **defendants** pursuant to Fed.R.Civ.P. 55(a). **Plaintiff** also requests default judgment on four counts of the complaint as well as an injunction permanently enjoining **defendants** from using the marks. Plaintiff alleges that: (1)

## SELECTED TOPICS

Trademark or Service Marks Infringement or Common Law Unfair Competition

### Secondary Sources

**Actual competition as necessary element of trademark infringement or unfair competition**

148 A.L.R. 12 (Originally published in 1944)

...Unfair competition ordinarily consists in the simulation by one person of the name, symbols, or devices employed by a business rival, or the substitution of the goods or wares or services of one person...

**Summary**

9A N.J. Pl. & Pr. Forms Ch. 80 Summary

...This chapter contains forms relating to various aspects concerning trade names, trademarks, and trade secrets, including complaints for infringement of trademarks and trade names and complaints concern...

**Trademark Infringement Litigation**

126 Am. Jur. Trials 481 (Originally published in 2012)

...This article discusses a cause of action for either likelihood of confusion or likelihood of dilution of a mark (i.e., an indicia of commercial origin). "Mark" is a term which includes all types of mat...

See More Secondary Sources

### Briefs

**BRIEF FOR RINGLING BROS.-BARNUM & BAILEY COMBINED SHOWS, INC., AMERICAN AUTOMOBILE ASSOCIATION, BACARDI & COMPANY LIMITED, BANK OF AMERICA, BENETTON GROUP, S.p.A., DEERE & COMPANY, NEWSWEEK, INC., PFIZER INC., PUBLIC BROADCASTING SERVICE, AND SOTHEBY 'S HOLDINGS, INC. AS AMICI CURIAE SUPPORTING RESPONDENTS**

2002 WL 1987618
Victor Moseley, Cathy Moseley, d/b/a Victor's Little Secret v. V Secret Catalogue, Inc.; Ringling Bros.-Barnum & Bailey Combined Shows, Inc.
Supreme Court of the United States
Aug. 23, 2002

...The amici curiae are owners of famous trademarks protected under the Federal Trademark Dilution Act of 1995 (FTDA), Pub. L. No. 104-98, 109 Stat. 985. The amici thus have a strong interest in the scope...

**Petition for a Writ of Certiorari**

1999 WL 33640173
RINGLING BROS.-BARNUM & BAILEY COMBINED SHOWS, INC., Petitioner, v. UTAH DIVISION OF TRAVEL DEVELOPMENT, Respondent.
Supreme Court of the United States
June 14, 1999

...All parties to this proceeding are listed in the caption of the case. Petitioner Ringling Bros.-Barnum and Bailey Combined Shows, Inc. is a wholly-owned subsidiary of Feld Entertainment, Inc. Petitione...

**Brief in Opposition**

plaintiff owns valid and enforceable trademark rights in the marks "Bad Boy" and "Bad Boy Club;" (2) defendants' use is unauthorized; (3) defendants' use will likely confuse the public with regard to the origin and sponsorship of the product; (4) defendants' use of the mark is deliberate and willful; and (5) the harm suffered is irreparable.

## II. JURISDICTION

This Court has original jurisdiction over plaintiff's claims arising under federal law pursuant to 28 U.S.C. § 1331, and supplemental jurisdiction over plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

## III. DISCUSSION

### A. Default

The first step in obtaining a default judgment is the entry of default. "When a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise, the clerk must enter the party's default." Fed.R.Civ.P. 55(a). Plaintiff has established that defendants failed to "plead or otherwise defend" by presenting a certification documenting its service on defendants. Defendants are therefore in default and it should be entered by the Clerk.[6]

### B. Default Judgment

"Federal Rule of Civil Procedure 55(b)(2) authorizes courts to enter a default judgment against a properly served defendant who fails to a file a timely responsive pleading." Chanel v. Gordashevsky, 558 F.Supp.2d 532, 535 (D.N.J.2008) (citing Anchorage Assoc. v. Virgin Is. Bd. of Tax Rev., 922 F.2d 168, 177 n. 9 (3d Cir.1990)). A party seeking default judgment "is not entitled to a default judgment as of a right," however. Franklin v. Nat'l Maritime Union of America, 1991 S. Dist LEXIS 9819, at *3–4, 1991 WL 131182 (D.N.J.1991) (quoting 10 Wright, Miller & Kane, Federal Practice and Procedure § 2685 (1983)), aff'd, 972 F.2d 1331 (3d Cir.1992). The decision to enter a default judgment is "left primarily to the discretion of the district court." Hritz v. Woma Corp., 732 F.2d 1178, 1180 (3d Cir.1984).

*2 Although every "well-pled allegation" of the complaint, except those relating to damages, are deemed admitted, Comdyne I. Inc. v. Corbin, 908 F.2d 1142, 1149 (3d Cir.1990), before entering a default judgment the Court must decide whether "the unchallenged facts constitute a legitimate cause of action, since a party in default does not admit mere conclusions of law," Chanel, 558 F.Supp.2d at 535 (citing Directv, Inc. v. Asher, No. 03–1969, 2006 WL 680533, at *1 (D.N.J. Mar.14, 2006)). If a review of the complaint demonstrates a valid cause of action, the Court must then determine whether plaintiff is entitled to default judgment.

### C. Analysis

#### 1. Whether Plaintiff has Stated Viable Causes of Action

#### a. Federal Claims

As noted above, plaintiff seeks a default judgment on the following federal claims: federal trademark infringement in violation of 15 U.S.C. § 1114 and federal unfair competition in violation of 15 U.S.C. § 1125(a). "Federal trademark infringement, 15 U.S.C. § 1114(1)(a), and a false designation of origin claim, 15 U.S.C. § 1125(a)(1)(A), are measured by identical standards pursuant to the Lanham Act."[7] Chanel, 558 F.Supp.2d at 536 (citing A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc., 237 F.3d 198, 210 (3d Cir.2000)). To establish either Lanham Act claim, the record must demonstrate that (1) plaintiff has a valid and legally protectable mark; (2) plaintiff owns the mark; and (3) the defendant's use of the mark to identify goods or services causes a likelihood of confusion. Id. The first two requirements are satisfied when a federally registered mark becomes incontestable; meaning the owner has filed affidavits stating that the mark is registered, that it has been in continuous use for five consecutive years, and that there has been no adverse decision concerning the registrant's ownership or right to registration. Fisons Horticulture, Inc. v. Vigoro Indus., Inc., 30 F.3d 466, 472 (3d Cir.1994). Here, plaintiff has established the first two elements. Plaintiff has demonstrated that it has valuable and legally protectable marks, "Bad Boy" and "Bad Boy Club," and that it owned such marks. Moreover, the marks were registered in 1987, 1997, and 2000, and have been used continuously for the required number of years.

Plaintiff has also established the third element. A likelihood of confusion exists "when the consumers viewing the mark would probably assume that the product or service it represents is associated with the source of a different product or service identified by a

https

2002 WL 32101159
Victor MOSELEY and Cathy Moseley, d1b1a
Victor's Little Secret, Petitioners, v. V SECRET
CATALOGUE, INC., Victoria's Secret Stores,
Inc., and Victoria's Secret Direct, LLC,
Respondents.
Supreme Court of the United States
Mar. 04, 2002

...FN1. Federal Trademark Dilution Act of
1995, Pub. L. No. 104-98, 109 Stat. 985
(codified at 15 U.S.C. § 1125(c)(1996)). The
VICTORIA'S SECRET trademark and service
mark (herein the "VICTORIA'S SECRET M...

See More Briefs

**Trial Court Documents**

The Alumni Ass'n of New Jersey
Institute of Technology v. The New
Jersey Institute of Technology

2014 WL 917051
THE ALUMNI ASSOCIATION OF NEW
JERSEY INSTITUTE OF TECHNOLOGY, A
New Jersey Nonprofit Corporation,
Plaintiff/Counterclaim-Defendant, v. THE NEW
JERSEY INSTITUTE OF TECHNOLOGY, A
Body Corporate and Politic, and John does
Numbers 1 through 10, Names being
Fictitious, Defendant/Counterclaim-Plaintiff.
Superior Court of New Jersey, Chancery
Division.
Feb. 28, 2014

...KLEIN, J.S.C. (Retired/On Recall) This
dispute arose out of the demise of the
relationship between defendant, the New
Jersey Institute of Technology ("NJIT" or "the
University") and its former afifiat...

Silla Jewelry Co., Ltd. v. Sunico LLC

2016 WL 427723
SILLA JEWELRY CO., LTD., Plaintiff, v.
SUNICO LLC, et al.,
Defendants/Counterclaimants.
Superior Court of New Jersey, Law Division.
Feb. 01, 2016

...Joseph G. Lee, Esq., on behalf of Plaintiff
Silla Jewelry, Co., Ltd. (Law Offices of Joseph
G. Lee, Esq.). William J. Volonte, Esq., on
behalf of Defendants/Counterclaimants
Sunico, LLC, et al. (Law Of...

Wingmaster Plus Inc. v. Meserlian

2004 WL 6019964
WINGMASTER PLUS INC., Plaintiff(s), v.
Steve MESERLIAN, Technical Products, Inc.,
et. al., Defendants; Technical Products, Inc.
and Steve Meserlian, Third Party Plaintiffs, v.
Cheryl K. Mujica, Third Party Defendant.
Superior Court of New Jersey, Law Division.
Dec. 21, 2004

...THIS MATTER having been tried before the
Court and a jury of eight on June 21, 22, 23,
24 and 25 and the jury having returned a
verdict in favor of the Plaintiff,
WINGMASTER PLUS, INC. against
Defendan...

See More Trial Court Documents

similar mark." *Ford Motor Co. v. Summit Motor Prods., Inc.,* 930 F.2d 277, 292 (3d Cir.1991) (citing *Scott Paper Co. v. Scott's Liquid Gold, Inc.,* 589 F.2d 1225, 1229 (3d Cir.1978)). "Proof of actual confusion is not necessary; likelihood is all that need be shown." *Opticians Ass'n of America v. Indep. Opticians of America,* 920 F.2d 187, 195 (3d Cir.1990). To determine if two similar marks are likely to cause confusion, ten factors have been considered, including:

> *3 (1)the degree of similarity between the owner's mark and the alleged infringing mark; (2) the strength of owner's mark; (3) the price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase; (4) the length of time the **defendant** has used the mark without evidence of actual confusion arising; (5) the intent of the **defendant** in adopting the mark; (6) the evidence of actual confusion; (7) whether the goods, though not competing, are marketed through the same channels of trade and advertised through the same media; (8) the extent to which the targets of the parties' sale efforts are the same; (9) the relationship of the goods in the minds of the public because of the similarity of function; and (10) other facts suggesting that the consuming public might expect the prior owner to manufacture a product in the **defendant's** market.

*Freedom Card, Inc. v. JPMorgan Chase & Co.,* 432 F.3d 463, 470 (3d Cir.2005) (citing *Interpace Corp. v. Lapp, Inc.,* 721 F.2d 460, 463 (3d Cir.1983)). While all factors should be considered, the degree of similarity seems to be most important. *Ford,* 930 F.2d at 292. "If the overall impression created by marks is essentially the same, 'it is very probable that the marks are confusingly similar.' " *Opticians,* 920 F.2d at 195 (quoting 2 McCarthy, Trademarks and Unfair Competition at § 23:7).

**Plaintiff's** registered "**Bad Boy** Club" mark, shown in Exhibit A of its complaint, is a distinct image of a boy flexing his arm with the words "**Bad Boy**" located above the boy's head and the word "Club" located below the boy's arm. This so-called "character" mark is used to designate the source of **plaintiff's** products on **promotional** materials, advertising, and commercial products. An identical image, shown in Exhibit B of the complaint, appears on the exterior sign of **defendants'** store. Because these two marks appear identical, **defendants'** use will likely cause confusion. Moreover, **plaintiff's** mark "**Bad Boy**" is also being utilized by **defendants** because they have named their store "**Bad Boy** Club Surf–Skate–Snow" and have advertised and listed the store on the World Wide Web. **Defendants** plainly use **plaintiff's** name "**Bad Boy**," and because **defendants** and **plaintiff** are both in the business of selling athletic clothing, there is likely to be confusion as to the origin of the products.

Therefore, **plaintiff's** allegations [8] are sufficient to state a cause of action that **defendants** infringed **plaintiff's** registered trademark in violation of the Lanham Act by intentionally and unlawfully using such marks to cause confusion as to their products origin.

**(b) State Claims**

**Plaintiff** also seeks default judgment on two state counts, statutory dilution and unfair competition and misappropriation under New Jersey law. In order for a **plaintiff** to establish a cause of action under New Jersey's dilution law, N.J.S.A. 56:3–13.20, **plaintiff** must show that **defendants** use **plaintiff's** marks, those marks are famous, and that **defendants'** use causes dilution of the distinctive quality of the mark. To determine if a mark is famous the court should consider:

> *4 (a)the degree of inherent or acquired distinctiveness of the mark; (b) the duration and extent of use of the mark; (c) the duration and extent of advertising and publicity of the mark; (d) geographical extent of the trading area in which the mark is used; (e) the channels of trade for the good or services with which the registrant's mark is used; (f) the degree of recognition of the registrant's mark in its and in the other's trading area and channels of trade; and (g) the nature and extent of the use of the same or similar mark by third parties.

N.J.S.A. 56:3–13.20. In **plaintiff's** complaint, it alleges that the marks have been used continuously for a number of years, that the trademarks are well and favorably known among consumers, and that the trademarks are widely publicized and recognized in the State of New Jersey as being identified with **plaintiff**. **Plaintiff**, however, has not alleged

facts sufficiently specific to establish the factors needed to consider the mark as famous. **Plaintiff** simply makes conclusory statements that its marks are famous, which is insufficient to state a cause of action. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2006) ("A **plaintiff's** obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."). Because of the general description of the marks, the Court can not determine as a matter of law if **plaintiff's** marks are famous.[9] Therefore, **plaintiff** has not stated a cause of action under New Jersey's dilution law.[10]

**Plaintiff's** other state law cause of action is unfair competition, N.J.S.A 56:4–1, which is identical to Section 43(a) of the Lanham Act. *Pharmacia Corp. v. Alcon Laboratories, Inc.*, 201 F.Supp.2d 335, 386 (D.N.J.2002) (citing *Apollo Distrib. v. Jerry Kurtz Carpet Co.*, 696 F.Supp. 140, 143 (D.N.J.1988)). Therefore, because the Court has found that **plaintiff** has stated a viable cause of action under the federal unfair competition law, it also finds that **plaintiff** has stated a viable cause of action under New Jersey's statutory unfair competition law.

### 2. Whether **Plaintiff** is Entitled to a Default Judgment

Now that it has been determined that **plaintiff** has stated viable causes of action for unfair competition under the Lanham Act and New Jersey state law and for federal trademark infringement, it must be determined whether **plaintiff** is entitled to a default judgment. As stated above, prior to entering judgment on the counts where a valid cause of action has been established, three factors must be considered: (1) prejudice to the **plaintiff** if default judgment is not granted; (2) whether the **defendant** has a meritorious defense; and (3) whether the **defendant's** delay was the result of culpable misconduct. *Chamberlain v. Giampapa*, 210 F.3d 154, 164 (3d Cir.2000).

#### a. Prejudice to the **Plaintiff**

In deciding whether **plaintiff** will be prejudiced, the Court can consider: (1) loss of available evidence; (2) increased potential for fraud; and (3) substantial reliance on the judgment. *Feliciano v. Reliant Tooling Co., Ltd.*, 691 F.2d 653, 657 (3d Cir.1982). Here, **plaintiff** will be prejudiced absent a default judgment. It appears that the businesses of **plaintiff** and **defendants** are both in the athletic clothing industry. Because **defendants** use the "Bad Boy" and "Bad Boy Club" marks to advertise and sell their clothing, the products of **defendants** will likely be confused with **plaintiff's** products. *See Maxnet Holdings, Inc. v. Maxnet, Inc.*, No. Civ. 98–3921, 1998 WL 855490, at *3 (E.D.Pa. Dec.10, 1998) (holding that because both the **plaintiff** and the **defendant** were in the computer industry and the **defendant** operated under the **plaintiff's** name the **defendant's** goods and services would be confused as the **plaintiff's**). Without a default judgment, **defendants'** infringement of **plaintiff's** marks will likely continue because **defendants** have not answered the numerous requests—both formal by way of this lawsuit and more informal by way of numerous letters—to stop using **plaintiff's** trademarks. **Plaintiff** has appeared to exhaust all available methods to inform **defendants** of their trademark violation, and without this judgment, then **plaintiff** will be prejudiced because it has no other recourse. *See, e.g., Frank Music Corp. v. Emerson's Pub, Inc.*, No. 4:08–CV0532, 2009 WL 744964, at *1 (M.D.Pa. Mar.18, 2009) ("If default is denied, **plaintiffs** face the prejudice of being unable to proceed with this action and the potential continued infringement of their copyrighted works.").

#### b. Existence of a Meritorious Defense

*5 "A claim, or defense, will be deemed meritorious when the allegations of the pleadings, if established at trial, would support recovery by **plaintiff** or would constitute a complete defense." *Poulis v. State Farm Fire and Cas. Co.*, 747 F.2d 863, 869–70 (3d Cir.1984); *accord United States v. $55,518.05 in U.S. Currency*, 728 F.2d 192, 195 (3d Cir.1984); *Feliciano*, 691 F.2d at 657; *Farnese v. Bagnasco*, 687 F.2d 761, 764 (3d Cir.1982). Here, it is axiomatic that the Court cannot consider **defendants'** defenses because **defendants** have failed to respond to this action. *See Prudential Ins. Co. of America v. Taylor*, No. 08–2108, 2009 WL 536403, at *1 (D.N.J.2009) ("[B]ecause Ms. Ducker has not answered or otherwise appeared in this action, the Court was unable to ascertain whether she has any litigable defenses."). It appears, however, that **defendants** would not have a meritorious defense because "Bad Boy" and "Bad Boy Club" are **plaintiff's** registered trademarks. *See Maxnet*, 1998 WL 855490 at *3 ("[T]he **Defendant** does not have a meritorious defense. Maxnet is a registered trademark ® of Maxnet Systems. Maxnet Systems is a privately held operating company of Maxnet Holdings."). There is also no evidence presented that shows the existence of a licensing agreement allowing

defendants to use plaintiff's marks. *See Broad. Music, Inc. v. Spring Mount Area Bavarian*, 555 F.Supp.2d 537, 542 (E.D.Pa.2008) (stating that since the parties had not entered into a licensing agreement and had no possible contractual dispute there was no defense). Because it is unrefuted that the trademarks are registered and owned by plaintiff, the Court finds that had defendants appeared in this action, they most likely would not have provided a meritorious defense.

c. Whether **Defendants'** Delay is the Result of Culpable Conduct
**Defendants'** delay appears to be the result of culpable conduct. "Culpable conduct is dilatory behavior that is willful or in bad faith." *Gross v. Stereo Component Sys., Inc.*, 700 F.2d 120, 123 (3d Cir.1983). **Plaintiff** presented exhibits establishing that it properly served **defendants**. There is nothing before the Court to suggest that **defendants'** failure to respond to **plaintiff's** complaint was caused by anything other than **defendants'** own culpability and willful negligence. *See Prudential*, 2009 WL 536403 at *1 ("[T]here was nothing before the Court to suggest that anything other than Ms. Ducker's willful negligence caused her failure to file an answer, and she was therefore culpable."); *cf. Gross*, 700 F.2d at 123 (holding that a "breakdown in communication" between the **defendant** and the **plaintiff** was not culpable conduct attributable to the **defendant** because the **defendant** was "actively attempting to contact" the **plaintiff**). Here, there is nothing in the record to suggest that **defendants** tried to contact **plaintiff**. Without any evidence suggesting otherwise, the Court concludes that the delay is due to **defendants'** culpable conduct.

*6 Because the Court has found that **plaintiff** has established three valid causes of action, and that the *Chamberlain* factors weigh in favor of default judgment, the Court finds that **plaintiff** is entitled to judgment.

3. Remedies

a. Statutory Damages
Now that it has been determined that **plaintiff** is entitled to a default judgment, the appropriate amount of damages must be determined. When a **plaintiff** establishes a violation of its trademarks, it is entitled to recover damages measured by the **defendant's** profits. 15 U.S.C. § 1117(a). Alternatively, a **plaintiff** may elect to recover statutory damages for the use of a counterfeit. 15 U.S.C. § 1117(c). For statutory damages, the **plaintiff** may recover not less than $1,000 or more than $200,000 per counterfeit mark. *Id*. If the court finds that the use of the counterfeit was willful, then the maximum amount recoverable is extended to $2,000,000. *Id*. In order for **plaintiff** to receive the maximum amount of damages, **defendants'** willful conduct must have included an "aura of indifference to **plaintiff's** rights" or a "deliberate and unnecessary duplicating of a **plaintiff's** mark ... in a way that was calculated to appropriate or otherwise benefit from the good will the **plaintiff** had nurtured." *Chanel*, 558 F.Supp.2d at 538 (citing *Louis Vuitton*, 211 F.Supp.2d at 583 (quoting *SecuraComm Consulting Inc. v. Securacom Inc.*, 166 F.3d 182, 187 (3d Cir.1999))).

In this **case**, to establish federal trademark counterfeiting, the record must show that (1) the **defendants** infringed a registered trademark in violation of the Lanham Act, 15 U.S.C. 114(1)(a), and (2) intentionally used the trademark knowing it was counterfeit or was willfully blind to such use. *Louis Vuitton Malletier & Oakley Inc. v. Veit*, 211 F.Supp.2d 567, 581 (E.D.Pa.2002); *Playboy Enter., Inc. v. Universal Tel–A–Talk, Inc.*, 1998 WL 767440, at *7 (E.D.Pa. Nov.3, 1998). "Willfulness can be inferred by the fact that a **defendant** continued infringing behavior after being given notice." *Louis Vuitton*, 211 F.Supp.2d at 584.

Both factors are established here. **Plaintiff** has stated a cause of action that **defendants** infringed on its trademarks. It has also shown that **defendants** intentionally continued to use the trademarks after they were notified of their infringing use. Therefore, **defendants'** conduct can be considered willful.

Having concluded that **defendant's** conduct was willful, the Court must decide the appropriate damages. If the damages are not for a "sum certain or for a sum which can by computation be made certain," Fed.R.Civ.P. 55(b)(1), the court can conduct a hearing, Fed.R.Civ.P. 55(b)(2). A hearing is not required, however, when statutory damages are involved because the very purpose of statutory damages is to provide the **plaintiff** with relief when damages are not assessable due to the **defendant's** conduct. *Lorillard Tobacco Co. v. Montrose Wholesale Candies & Sundries, Inc.*, Nos. 03 C 5311 and 03 C 4844, 2008 WL 1775512, at *3–4 (N.D.Ill. Apr.17, 2008). "In the absence of clear

guidelines for setting a statutory damage award, courts tend to use their wide discretion to compensate **plaintiffs**, as well as to deter and punish **defendants**, often borrowing from factors developed in fixing a statutory damage award for copyright infringement." *Louis Vuitton,* 211 F.Supp.2d at 583. The factors considered for statutory damages in copyright infringement are:

> **\*7** (1) the expenses saved and the profits reaped; (2) the revenues lost by the **plaintiff**; (3) the value of the copyright; (4) the deterrent effect on others besides the **defendant**; (5) whether the **defendant's** conduct was innocent or willful; (6) whether a **defendant** has cooperated in providing particular records from which to assess the value of the infringing material produced; and (7) the potential for discouraging the **defendant**.

*Phillip Morris USA, Inc. v. A & V Minimarket, Inc.,* 592 F.Supp.2d 669, 673 (S.D.N.Y.2009).

**Plaintiff** asks for $50,000 per violation for four infringements ($200,000 in total): (1) **defendants'** Marlton store is named "**Bad Boy Club** Surf–Skate–Snow;" (2) the sign at the exterior of the store includes the "**Bad Boy Club**" character mark; (3) **defendants** used the "**Bad Boy Club**" mark as the name of their Morristown store; and (4) **defendants** have utilized, through advertising and listing, the "**Bad Boy Club**" and "**Bad Boy**" marks on the World Wide Web. [11] **Plaintiff**, however, does not address any of the factors the Court should consider in determining statutory damages or provide any explanation for the specific amount requested. Without detailed affidavits to support their requested amount of damages, the Court might be inclined to award the minimum amount of damages. However, to do so here would undermine the purpose of statutory damages to deter willful **defendants**. [12] The Court notes that in **cases** of willful infringement, Congress has increased the maximum statutory damages by a multiple of ten, from $200,000 to $2,000,000. To further the intent of Congress to deter willful conduct, the Court will apply the same multiplier to the minimum statutory damages amount to determine the appropriate statutory damages in this **case**. [13] Therefore, the Court will award $10,000 per violation, which is ten times the minimum statutory damage amount. This amount recognizes **defendants'** willful conduct, penalizes them for failure to appear in this action, and will serve both as a specific deterrent for these **defendants** and a general deterrent for others contemplating the infringement of valid trademarks.

The Court further finds that there are four infringements of the marks. Two infringements involve the use of the "**Bad Boy**" mark in the Marlton store name and on the World Wide Web. Two infringements involve the "**Bad Boy Club**" character mark on the exterior sign at the Marlton store and on the World Wide Web. The Court does not count as a violation the marks used at the Morristown store because it was closed prior to **defendants'** being notified of their infringement, and, therefore, there is no proof that their use was willful. Accordingly, total statutory damages awarded will be $40,000.

### b. Permanent Injunction

**Plaintiff** is also seeking a permanent injunction. A permanent injunction is another remedy offered by the Lanham Act. 15 U.S.C. § 1116(a). In deciding whether to grant a permanent injunction, the Court must consider whether: (1) the moving party has shown actual success on the merits; (2) the moving party will be irreparably injured by the denial of injunctive relief; (3) the granting of the permanent injunction will result in even greater harm to the **defendant**; and (4) the injunction would be in the public interest. *Gucci America, Inc. v. Daffy's, Inc.,* 354 F.3d 228, 236–37 (3d Cir.2003) (citing *Shields v. Zuccarini,* 254 F.3d 476, 482 (3d Cir.2001)).

### i. Success on the Merits

**\*8** The Court has found that **plaintiff** has established a cause of action under the Lanham Act. Consequently, the first factor weighs in favor of **plaintiff**.

### ii. Irreparable Harm

Irreparable harm "must be of a peculiar nature, so that compensation in money alone cannot atone for it." *Opticians,* 920 F.2d at 195 (quoting *Morton v. Beyer,* 822 F.2d 364, 372 (3d Cir.1987)). Grounds for finding irreparable injury include loss of control of reputation, loss of trade, and loss of good will. *Id.* (citing 2 McCarthy, at § 30:18). "Potential damage to reputation constitutes irreparable injury ... in a trademark **case**." *Id.* Moreover, irreparable injury can be based on the possibility of confusion. *Id.* at 196. Courts have held that trademark infringement amounts to irreparable injury as a matter of law. *S & R Corp. v. Jiffy Lube Intern., Inc.,* 968 F.2d 371, 378 (3d Cir.1992); *Opticians,*

920 F.2d at 196. Here, because the Court has found that there is a likelihood of confusion, the second factor weighs in favor of **plaintiff**.

### iii. Balance of Harm

**Defendants'** use of **plaintiff's** marks is causing harm to **plaintiff**. Even though **defendants** might suffer some economic losses if they are unable to use "**Bad Boy**" and "**Bad Boy** Club," they would have not been subjected to such harm had they not improperly used **plaintiff's** marks. *See Opticians*, 920 F.2d at 197 ("[T]he IOA can hardly claim to be harmed, since it brought any and all difficulties occasioned by the issuance of an injunction upon itself ."). Thus, the balance of harm weighs in favor of **plaintiff**.

### iv. Public Interest

"Public interest can be defined a number of ways, but in a trademark **case**, it is most often a synonym for the right of the public not to be deceived or confused." *Opticians*, 920 F.2d at 197 (citing 2 McCarthy, § 30:19). Because the Court has found that there is a likelihood of consumer confusion due to **defendants'** use of **plaintiff's** trademarks, and that such confusion will likely continue, the public interest would be damaged if a permaent injunction is not issued. *See id.* at 198 ("Having already established that there is a likelihood of consumer confusion created by the concurrent use of the Guild marks, it follows that if such use continues, the public interest would be damaged."). Thus, the final factor also weighs in favor of **plaintiff**.

Because all four factors weigh in favor of **plaintiff**, the Court will grant **plaintiff's** request to permanently enjoin **defendants** from using **plaintiff's** marks, "**Bad Boy**" and "**Bad Boy Club**."

### c. Attorney's Fees and Costs

**Plaintiff** has also requested attorney's fees and costs. "Reasonable attorney's fees may be awarded in exceptional **cases**; exceptional **cases** include those where the court has made a finding of willingness." 15 U.S.C. § 1117(a); *Seruracomm*, 224 F.3d at 280; *Louis Vuitton*, 211 F.Supp.2d at 567. **Plaintiff** is also entitled to recover costs it incurred in this action, including filing fees, photocopying fees, and postage expenses, if there is a finding of willfulness. 15 U.S.C. § 1117(a). Because the Court has found that **defendants** have acted willfully, **plaintiff** is entitled to attorney's fees and costs. The Court has reviewed **plaintiff's** counsel's certification of attorney's fees and costs. **Plaintiff** requests $18,537.08 in attorney's fees and $869.97 in costs. These expenses appear to be reasonable and fair.[14] Therefore, **plaintiff** is entitled to recover its requested attorney's fees and costs.

### IV. CONCLUSION

*9 For the reasons expressed above, **plaintiff's** motion for default is granted. **Plaintiff's** motion for default judgment is granted on counts 1, 2, and 6 and denied on count 4. All other counts and claims against Michael Shoppe are dismissed per **plaintiff's** request. Statutory damages are awarded to **plaintiff** in amount of $40,000 along with $18,537.08 in attorney's fees and $869.97 in costs. A permanent injunction will be issued ordering **defendants** to stop using **plaintiff's** trademarks.

An appropriate order will be entered.

### All Citations

Not Reported in F.Supp.2d, 2009 WL 2147843

| Footnotes |  |
| --- | --- |
| 1 | **Plaintiff** also named Michael Shoppe as a **defendant** but in its motion **plaintiff** asks the Court to dismiss all claims against Mr. Shoppe. |
| 2 | USPTO Registration No. 76037086, registered April 28, 2000; USPTO Registration No. 74730490, registered March 18, 1997; USPTO Registration No. 2060484, registered May 13, 1997. |
| 3 | USPTO Registration No. 1,469,124, registered December 15, 1987. |
| 4 | **Plaintiff's** complaint alleges eight counts, but in its motion it states it wishes to dismiss four counts and only requests default judgment on the remaining four counts, which are: (1) federal trademark infringement in violation of 15 U.S.C. § 1114; (2) federal unfair competition in violation of 15 U.S.C. § |

1125(a); (4) statutory dilution under N.J.S.A. 56:3–13.20; and (6) unfair competition and misappropriation under N.J.S.A 56:4–1. **Plaintiff** requests statutory damages, injunctive relief, and attorney's fees and costs.

5        **Plaintiff** tried numerous times to personally serve **defendants**. The first attempts were made in June and July of 2008. After these attempts at personal service failed, **plaintiff** filed an application with the Court asking to serve **defendants** through alternative means pursuant to Fed.R.Civ.P. 4(e) (1). The Court granted **plaintiff's** request on September 19, 2008. **Plaintiff** then served **defendants** through the alternative means (certified mail, return receipt requested, and regular mail). All packages sent to **defendants** via certified mail, return receipt requested were returned by the United States Post Office as refused. However, the packages sent to **defendants** via regular mail were not returned. Thus, service is deemed effected. *See* Fed.R.Civ.P. 4(e)(1) (providing that service may be effected by "following state law for serving a summons in an action brought in courts of general jurisdiction in the state where the district court is located or where service is made[.]"); *Citibank, N.A. v. Russo,* 334 N.J.Super. 346, 759 A.2d 865, 868 (N.J.Super.Ct.App.Div.2000) (stating service is valid by regular mail even if **defendant** does not answer or appear or certified mail was returned).

6        Typically, a **plaintiff** moves for default pursuant to Rule 55(a) separately from its motion for default judgment. Due to the particular circumstances of this **case**, judicial economy warrants this combined motion.

7        Accordingly, the first two counts will be dealt with under one analysis.

8        Because **defendants** are in default, the Court accepts **plaintiff's** allegations as true.

9        Even if the mark was famous, **plaintiff** would still need to establish that there was actual dilution that lessened the capacity of **plaintiff's** mark to identify and distinguish goods or services. *Times Mirror Magazines, Inc. v. Las Vegas Sports News,* 212 F.3d 157, 163 (3d Cir.2000). The factors considered to determine whether there has been dilution under the federal statute include: "actual confusion and likelihood of confusion, shared customer and geographic isolation, the adjectival quality of the junior use, and the interrelated factors of duration of the junior use, harm to the junior use, and delay by the senior user in brining the action." *Id.* at 168. **Plaintiff** has not properly alleged these elements either.

10       The Court notes that **plaintiff** withdrew its federal dilution claim, which applies the same analysis as a state dilution claim. *800–JR Cigar, Inc. v. GoTo.com, Inc.,* 437 F.Supp.2d 273, 294 (D.N.J.2006).

11       **Plaintiff** provides a Google search print out, in Exhibit C of the complaint, which shows **plaintiff's** marks being used in advertising and listing **defendants'** store on multiple websites. The Court notes that **defendants** also have a website, bbcskate.com.

12       Some courts have awarded statutory damages based on **plaintiff's** estimation of **defendant's** profits or **plaintiff's** specific reasons why the minimum should not be awarded. See *Chanel,* 558 F.Supp.2d at 538 (allowing statutory damages to be awarded in the amount that the **plaintiff** estimated to be actual damages); *Louis Vuitton,* 211 F.Supp.2d at 585 (awarding $1.5 million for the use of eight marks due to the egregious conduct of the **defendants** and their use of the internet). **Plaintiff** has not offered such proofs in this **case.**

13       While Congress has established an increased maximum for statutory damages when there is willful conduct, they fail to specifically increase the minimum.

14       **Plaintiff's** counsel charged $240 and $325 per hour for their services and other **cases** have awarded attorney's fees with similar hourly rates. *See Chanel,* 558 F.Supp.2d at 539 (holding that Chanel's counsel's charged rates of $275 and $350 per hour of their services was reasonable and fair).

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL NO. 10-_____ |
| v. | : | DATE FILED: July 29, 2010_____ |
| RICHARD LAZAR | : | VIOLATIONS: |
| DAVID FELDMAN | | 18 U.S.C. § 371 (conspiracy - 1 count) |
| | : | 18 U.S.C. § 1341 (mail fraud - 1 count) |
| | | 18 U.S.C. § 2 (aiding and abetting) |
| | : | Notice of forfeiture |

**I N D I C T M E N T**

**COUNT ONE**

**THE UNITED STATES ATTORNEY CHARGES THAT:**

At all times material to this indictment:

1.　　From in or about January 2006 to on or about July 17, 2009, in the Eastern

District of Pennsylvania, and elsewhere, defendants

**RICHARD LAZAR and
DAVID FELDMAN**

conspired and agreed to knowingly devise a scheme to defraud, and for obtaining money and

property by means of false and fraudulent pretenses, representations, and promises, and to use the

United States mails and commercial interstate carriers to further the scheme to defraud, in violation

of Title 18, United States Code, Section 1341.

**MANNER AND MEANS**

It was part of the conspiracy that:

2.　　Defendants RICHARD LAZAR and DAVID FELDMAN operated

businesses in Pennsylvania and Nevada that purported to place advertisements for customers in

publications aimed at individuals in the fields of law enforcement and public safety.

3.      Defendants RICHARD LAZAR and DAVID FELDMAN obtained names and contact information for small businesses throughout the United States to use in their fraudulent scheme.

4.      Defendants RICHARD LAZAR and DAVID FELDMAN solicited money from these small businesses in exchange for placing advertisements in the publications knowing that the publications did not exist or were not circulated.

5.      Defendants RICHARD LAZAR and DAVID FELDMAN used the United States Mails and commercial interstate carriers to facilitate their fraud and established a Federal Express account to send invoices and collect payment from the victim businesses.

6.      Defendants RICHARD LAZAR and DAVID FELDMAN falsely told victim businesses that they had previously agreed to pay for an advertisement in the magazine, and that the magazine had already been printed.

7.      After the businesses agreed to pay for the advertisements based on the false representations made by defendants RICHARD LAZAR and DAVID FELDMAN, defendants LAZAR and FELDMAN instructed the businesses that they would receive an invoice in the mail, and that payment was due immediately upon delivery of the invoice.

8.      Defendant RICHARD LAZAR then sent an invoice to the victim business by Federal Express with instructions that payment was due upon receipt.

9.      Defendants RICHARD LAZAR and DAVID FELDMAN induced more than 950 businesses to pay for advertising by sending checks or money orders by Federal Express to defendant LAZAR'S residence in Churchville, Pennsylvania or a mail drop in Willow Grove, Pennsylvania.

2

10.    Defendant RICHARD LAZAR cashed the victim businesses' checks and money orders at two check cashing services in Philadelphia.  Defendant LAZAR forwarded a percentage of the proceeds of the scheme to defendant DAVID FELDMAN, and kept the remainder for his own use.  Defendants LAZAR and FELDMAN received approximately more than $1.3 million from the scheme.

## OVERT ACTS

In furtherance of the conspiracy and to accomplish its objects, defendants RICHARD LAZAR and DAVID FELDMAN committed the following overt acts, among others, in the Eastern District of Pennsylvania and elsewhere:

1.    Defendant RICHARD LAZAR registered the following companies with the Pennsylvania Bureau of Corporations, claiming they were public safety related magazines:  (a) *Ameri Publishing*; (b) *Crime Prevention News Police Beat*; (c) *Police Beat*; and (d) *Fire Extinguisher Magazine*.

2.    Defendant DAVID FELDMAN established DK Publishing, which purported to be a public safety-related publishing company in Nevada.

3.    Defendant RICHARD LAZAR established an account with Federal Express, a commercial interstate carrier, to send and receive documents, checks, and money orders in furtherance of this fraudulent scheme.

4.    Defendants RICHARD LAZAR and DAVID FELDMAN solicited small businesses from across the United States, but not in Pennsylvania, to purchase advertising in their public safety magazines, even though the defendants knew that their magazines either would not be published or widely circulated.  Each solicitation is alleged as a separate overt act.

5.      On or about the following dates, defendants RICHARD LAZAR and DAVID

FELDMAN made fraudulent sales of advertisements to the following companies and claimed that

the advertisement would be placed in the publication listed below, each sale is alleged as a separate

overt act:

| Date of Sale | Victim | Publication |
|---|---|---|
| May 2, 2008 | Wiseway Self Storage | Police Times |
| October 1, 2008 | ReMax | Crime Prevention News, Fire Extinguisher, Fire Journal, and Police Journal |
| December 8, 2008 | Louie's Watch Repair | Crime Times, Criminal Justice Bulletin, Police Magazine, Police Times, and Fire Journal |
| April 22, 2009 | Butler and Cook | Crime Times, Police Beat, Police Times, and Police Journal |
| May 6, 2009 | J & C Campers | Fire Journal |
| May 14, 2009 | Millers Creek Pharmacy | Police Journal, Fire Journal, and Volunteer Fireman |

All in violation of Title 18, United States Code, Section 371.

4

**COUNT TWO**

**THE GRAND JURY FURTHER CHARGES THAT:**

        1.      Paragraphs Two through Ten and Overt Acts One through Five of Count One are incorporated here.

        2.      From in or about January 2006 through on or about July 17, 2009, defendants

**RICHARD LAZAR and**
**DAVID FELDMAN**

devised and intended to devise a scheme to defraud, and to obtain property by means of false and fraudulent pretenses, representations and promises.

        3.      On or about April 7, 2009, in the Eastern District of Pennsylvania, and elsewhere, defendants

**RICHARD LAZAR and**
**DAVID FELDMAN,**

for the purpose of executing the scheme described above, and attempting to do so, and aiding and abetting its execution, knowingly caused to be delivered by commercial interstate carrier from the Eastern District of Pennsylvania, according to the directions thereon, an invoice, which falsely represented that a victim business had purchased an advertisement in a public safety magazine, when, in fact, as defendants LAZAR and FELDMAN knew, no such advertisement had been placed in a public safety magazine.

        In violation of Title 18, United States Code, Sections 1341, and 2.

5

## NOTICE OF FORFEITURE

**THE GRAND JURY FURTHER CHARGES THAT:**

       1.    As a result of the violations of Title 18, United States Code, Sections 371 and 1341, set forth in this indictment, defendants

**RICHARD LAZAR and
DAVID FELDMAN**

shall forfeit to the United States of America any property that constitutes, or is derived from, proceeds obtained directly or indirectly from the commission of such offense, including but not limited to the sum of approximately $1.3 million.

       2.    If any of the property subject to forfeiture, as a result of any act or omission of the defendants:

       (a)    cannot be located upon the exercise of due diligence;

       (b)    has been transferred or sold to, or deposited with, a third party;

       (c)    has been placed beyond the jurisdiction of the Court;

       (d)    has been substantially diminished in value; or

       (e)    has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 18, United States Code, Section 982(b), incorporating Title 21, United States Code, Section 853(p), to seek forfeiture of any other property

6

of the defendants up to the value of the property subject to forfeiture.

     All pursuant to Title 18, United States Code, Section 981(a)(1)(c) and Title 28, United States Code, Section 2461.

**A TRUE BILL:**

_____

**GRAND JURY FOREPERSON**

_____

**ZANE DAVID MEMEGER**
**United States Attorney**